**FOURTH DIVISION**
**ELLINGTON, P. J.,**
**BRANCH and MERCIER, JJ.**

**NOTICE: Motions for reconsideration must be**
***physically received* in our clerk's office within ten**
**days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**July 12, 2016**

# In the Court of Appeals of Georgia

A16A0385. MCLAUGHLIN v. THE STATE.

BRANCH, Judge.

Following a jury trial, Kimberly West McLaughlin was convicted in Cobb County Superior Court of a single count of aggravated assault. McLaughlin now appeals from the denial of her motion for a new trial, arguing that she received ineffective assistance of counsel based on her attorney's failure to seek a continuance to obtain evidence of battered person syndrome to use in support of McLaughlin's sole defense. We agree, and we therefore reverse the trial court's order.

"On appeal from a criminal conviction, the defendant is no longer entitled to a presumption of innocence and we therefore construe the evidence in the light most favorable to the jury's guilty verdict." *Marriott v. State*, 320 Ga. App. 58 (739 SE2d 68) (2013) (citation omitted). So viewed, the record shows that McLaughlin's

conviction resulted from a January 2012 altercation between McLaughlin and her then-boyfriend, Jeffrey Kovanda, that resulted in injuries to Kovanda. At the time of the incident, McLaughlin and Kovanda, who had dated or lived together periodically since approximately July 2010, were living together in a camper owned by Jeff Worth.[1] Also present was a mutual friend of the couple, Brent Hanie.

On the night in question, McLaughlin and Kovanda got into an argument during which McLaughlin, who was standing at or near the kitchen sink, picked up a knife. Kovanda testified that he was sitting on the sofa when the argument began, with McLaughlin eventually approaching him holding the knife. Kovanda then stood up and as the argument continued, it apparently became physical to some degree. After the argument ended and Kovanda had returned to sit on the sofa, he felt blood running on his torso and discovered that he had been stabbed.[2] Kovanda asked

---

[1] Worth, a personal friend of McLaughlin, is also the father of McLaughlin's adult son.

[2] Kovanda denied being physically aggressive with McLaughlin, and testified that McLaughlin stabbed him when he stood up as she approached him. McLaughlin, however, testified that the stabbing occurred when during the course of the argument, Kovanda approached her as she was standing at the kitchen sink, holding a knife. According to McLaughlin, Kovanda attempted to grab her and she pushed him away, cutting him in the process. Both parties agreed that however the stabbing occurred, Kovanda did not realize he had been injured until sometime after the argument had ended.

McLaughlin to apologize, but she refused. According to both McLaughlin and Hanie,[3] when McLaughlin refused to apologize, Kovanda moved towards her aggressively, and Hanie had to get in between the couple to prevent Kovanda from physically assaulting McLaughlin. McLaughlin then picked up a knife, which Hanie took from her and tossed onto the camper's bed. Hanie then took Kovanda outside the camper, where Kovanda called the police.[4]

A patrol car responded to Kovanda's 911 call, and the responding officer detained McLaughlin at the scene until detectives arrived.[5] Kovanda was taken to the hospital by ambulance and was treated for his injuries, which included a "puncture-type wound" on the lower part of his left buttock, near the hip; a "slashing or glancing

---

[3] The stabbing apparently occurred while Hanie was standing outside of the camper, talking on his cell phone. Thus, Hanie did not witness either the stabbing or any altercation that resulted in Kovanda's injuries.

[4] According to the detective in charge of the investigation, Kovanda admitted to police that he did not decide to call them until after McLaughlin refused to apologize.

[5] The patrol officer encountered McLaughlin as she was in a car, preparing to leave the trailer park. As McLaughlin was exiting the trailer park, however, she saw police driving into the park and, assuming that they were responding to Kovanda's call, McLaughlin pulled to the side of the road. The responding officer confirmed that McLaughlin pulled over to the side of the road as soon as she saw the patrol car and without the officer having to activate his lights or siren.

3

injury" on the left side of his torso, near the rib cage; and a slash on the inside of his right forearm. Doctors closed the puncture wound with staples, but neither of the other wounds was deep enough to require surgical closure.

Detective Amy Worthington, the lead investigator on the case, testified that police collected two knives from inside the camper, and both appeared to have blood on them. A butcher knife was found on top of the bed in the camper, while a smaller knife was found near the sink in the kitchen area. When Worthington interviewed McLaughlin at the police station later that evening, McLaughlin smelled of alcohol. In response to a question from the detective, McLaughlin stated that she had consumed four beers earlier that night.

Following the police investigation, McLaughlin was indicted on one count of aggravated assault and one count of battery. At trial, in addition to the evidence concerning the indicted crimes, the State also introduced evidence of two prior incidents between the couple, each of which had resulted in McLaughlin's criminal conviction. The evidence showed that a January 2011 altercation between McLaughlin and Kovanda resulted in McLaughlin being indicted on one count of battery and two counts of simple battery (the "January 2011 case"). McLaughlin entered a negotiated guilty plea on this indictment, pursuant to which she pled guilty

4

to a single count of battery and received a sentence of 25 days incarceration, which represented the amount of time she had served in jail following her arrest.

The indictment and guilty plea in the January 2011 case arose out of an incident where McLaughlin bit Kovanda's finger, drawing blood. According to Kovanda, the bite occurred when, after the couple had argued, Kovanda prepared to exit their apartment. In attempting to leave, Kovanda tried to "move [McLaughlin] out of the way" and he stuck his hand out towards McLaughlin's face. When he did so, his finger "ended up in [McLaughlin's] mouth and she took a bite[.]" According to McLaughlin, however, the incident occurred after Kovanda came home brandishing a gun and accusing McLaughlin of being unfaithful. When McLaughlin denied Kovanda's allegations, Kovanda grabbed her face and pushed her backwards. As Kovanda did so, his finger went into McLaughlin's mouth and she bit him. Kovanda left the apartment with McLaughlin's cell phone and called police. Police later arrested McLaughlin after they could not locate the gun she claimed Kovanda had threatened her with. At trial, however, Kovanda did not deny that on the day of the January 2011 incident, he came into the house with a gun.

The State also introduced evidence showing that in December 2011, McLaughlin was indicted on one count of simple assault and one count of battery

based on an altercation she had with Kovanda in October 2011 (the "October 2011 case"). Shortly after her indictment, McLaughlin entered into a negotiated guilty plea, pursuant to which she pled guilty to both counts of the indictment and was placed on probation for 24 months.[5] The indictment and guilty plea in the October 2011 case resulted from an incident in which McLaughlin injured Kovanda with a knife described as a utility or razor knife. Kovanda testified that as he was sitting at a desk, he and McLaughlin argued over whether Kovanda was texting another woman. McLaughlin approached him with the utility knife in her hand and held the weapon to Kovanda's neck, inflicting a cut behind his left ear. When Kovanda then stood up, McLaughlin slashed his arm. Kovanda sought treatment for his wounds the following day, and both the cut behind Kovanda's left ear and on his left forearm required stitches. After receiving treatment, Kovanda then went to the police station to report the incident. After McLaughlin was arrested and indicted, however, Kovanda asked the district attorney to drop the charges.

---

[5] One of the conditions of McLaughlin's probation was that she could not contact Kovanda without his permission. After McLaughlin was sentenced, however, Kovanda wrote her probation officer, advising him that McLaughlin had Kovanda's permission to be in contact with him.

6

According to McLaughlin, Kovanda initiated the incident resulting in the October 2011 case by attacking her both physically and verbally while he was under the influence of methamphetamine. McLaughlin testified that when upset, she often cut herself as a form of coping. On the night in question, she was cutting herself with a razor knife. Kovanda encouraged her, telling her that she should "just go ahead and cut [her] wrist and get it over with." Kovanda then began to walk towards her, encouraging her to cut her wrists and when he reached her, he grabbed the arm in which McLaughlin was holding the knife. In the ensuing struggle, Kovanda received the cut behind his ear and on his forearm.

McLaughlin's defense at trial was justification, and she claimed that Kovanda's injuries resulted from her efforts to defend herself. See OCGA § 16-3-21 (a) ("[a] person is justified in threatening or using force against another when and to the extent that . . . she reasonably believes that such threat or force is necessary to defend . . . herself . . . against such other's imminent use of unlawful force"). Prior to trial, McLaughlin's attorney filed a motion pursuant to OCGA § 16-3-24.2[6] to dismiss the indictment based on justification. The trial court held a hearing on that motion, and

_____

[6] That statute provides, in relevant part, that a person who is justified in threatening or using force against another to defend to defend themselves "shall be immune from criminal prosecution." OCGA § 16-3-24.2.

after hearing the evidence, denied the same. The court did, however, allow McLaughlin to pursue her justification defense at trial.

In support of her justification defense, McLaughlin offered evidence of the abusive nature of her relationship with Kovanda. Specifically, McLaughlin testified that following the January 2011 incident, Kovanda destroyed her car with a baseball bat and sold it for scrap. In February 2011, Kovanda physically assaulted her twice and during the second assault he threw McLaughlin to the ground with such force that she sustained a black eye and a broken ankle. Following that incident, Kovanda began a pattern of abusing McLaughlin emotionally and physically. The physical abuse included Kovanda's choking her and attempting to suffocate her. The physical abuse resulted in McLaughlin's suffering bloody noses, black eyes, bruises, cut marks, and scrapes. In June 2011, Kovanda's assault on McLaughlin led her to seek treatment at a hospital for injuries to her leg, hip, and arm, as well as a concussion. Hospital personnel contacted police, and McLaughlin admitted to them that her boyfriend had beaten her, but she refused to identify the boyfriend to police.

McLaughlin stated that during the time she lived with Kovanda between February 2011 and January 2012, she would leave the couple's residence approximately once a week and would remain away anywhere from overnight to a

8

few days. She repeatedly returned to Kovanda, however, because she loved him and "because when he's not on [methamphetamine], he's a different person. Because he would always call me, begging me to come back and telling me that he would never do it again and I believed him." McLaughlin also explained that she never reported Kovanda to the police because she had grown up in an abusive home, with parents who frequently fought. During some of those fights, McLaughlin called the police and her parents were taken to jail. When her parents were released, McLaughlin would then receive a beating for calling the police. McLaughlin then stated, "and I would just – can't go through that again. I can't do that anymore."

Worth, the friend in whose camper McLaughlin was living in January 2012, testified and confirmed McLaughlin's claims of abuse. According to Worth, beginning in approximately March 2011, McLaughlin frequently called him to come and get her. Worth explained that when he picked her up "depending on the altercation [McLaughlin and Kovanda] had, [McLaughlin] could [have] a bloody nose, a black eye, a scratch here and there . . . I've seen her with black eyes from [Kovanda], I've seen her throat, where he's choked her, bruised." Worth also stated that on one occasion when he went to pick McLaughlin up, Kovanda came out of the house and assaulted him with a baseball bat. According to Worth, McLaughlin asked

9

him not to call the police regarding Kovanda, and he explained his belief that McLaughlin did not want police involved "largely because of what went on in her past life with her mom and dad, her calling the police on her mom and dad."

Kovanda also acknowledged the abusive nature of his relationship with McLaughlin, admitting on cross-examination to destroying McLaughlin's car and selling it for scrap; to pushing McLaughlin to the floor so hard that she broke her ankle; and to injuring McLaughlin to the extent that she had to seek treatment at a hospital in June 2011. Kovanda further admitted that McLaughlin had lied to police regarding the origin of her injuries to protect him. Additionally, Kovanda acknowledged that during the late spring and summer of 2011 he was so physically violent towards McLaughlin that she had to call someone to come get her approximately three to four times per month.

The State attempted to refute McLaughlin's justification defense by eliciting testimony from Detective Worthington as to what factors police rely on to determine whether a person is a victim of domestic violence. According to the detective, the primary factor police consider is whether the victim attempted to distance herself from her abuser. Specifically, police look to whether the alleged victim attempted to obtain a temporary protective order, moved to a shelter for battered women, and/or

changed her phone number in an effort to keep her abuser from contacting her. Thereafter, during the prosecutor's cross examination of McLaughlin, the State established that McLaughlin had not reported Kovanda's conduct to police, had never sought a temporary protective order or moved to an available shelter, and had remained with Kovanda during the time the alleged abuse was occurring.

The State also impeached McLaughlin's testimony by introducing recordings of phone conversations between Kovanda and McLaughlin, which occurred while McLaughlin was in the Cobb County jail awaiting trial on the current charges. During those conversations, McLaughlin appeared to admit fault for the stabbing and repeatedly expressed her remorse for the same, apologizing to Kovanda on multiple occasions. McLaughlin also repeatedly emphasized how much she loved Kovanda and stated that she could not live without him and could not stand to be separated from him. The recordings also showed that McLaughlin granted Kovanda a power of attorney so he could cash her unemployment checks and she encouraged Kovanda to use the money on himself. In only one of those conversations, recorded on February

11

6, 2012, did McLaughlin express any type of anger at Kovanda, and even that conversation ended with McLaughlin sobbing.[7]

Based on the foregoing evidence, the jury found McLaughlin guilty of both aggravated assault and battery. Following her conviction, McLaughlin filed a motion for a new trial, arguing that trial counsel was ineffective for failing to obtain expert testimony on the issue of battered person syndrome ("BPS"). At the hearing on that motion, McLaughlin's trial counsel testified that he had represented McLaughlin on the two criminal cases arising out of the January 2011 and October 2011 altercations between McLaughlin and Kovanda. After a different attorney was appointed to represent McLaughlin in the current case, a friend of McLaughlin contacted trial counsel and told him of the pending charges in this case. The attorney then visited

---

[7] We cannot tell from the record if the entire February 6 conversation was played for the jury. In reviewing the record on appeal, therefore, we reviewed this conversation in its entirety. The contents of the recording reveal that an emotional McLaughlin was dealing with the very recent death of her young grandson. Additionally, certain statements made during the February 6 conversation allege that McLaughlin's trial counsel engaged in conduct with respect to his client that would violate professional and ethical standards. If these statements are true, then such conduct by trial counsel would also be relevant to McLaughlin's ineffective assistance claim. Given that we have found ineffective assistance for the reasons explained below in Divisions one and two, however, we need not address these statements in this appeal.

McLaughlin in jail and agreed to represent her pro bono. On June 27, 2012, counsel filed both an entry of appearance in the case and a statutory speedy trial demand.[8]

Trial counsel testified that despite having previously represented McLaughlin, he did not realize the extent to which Kovanda had abused her until the hearing on McLaughlin's motion to dismiss the indictment based on justification.[9] During his 30-plus years as a criminal defense attorney, counsel had become familiar with BPS, its elements, and how to prove it, including the necessity for expert testimony. As he listened to the testimony at the hearing on the motion to dismiss, it occurred to the attorney that McLaughlin likely suffered from BPS and that the same would support her defense. Specifically, counsel stated that he knew that a victim suffering from BPS often accepted the blame for the abuser's conduct and continued to express love

---

[8] A defendant who files a speedy trial demand pursuant to OCGA § 17-7-170 must be tried either during the term of court in which the demand is filed "or at the next succeeding regular court term thereafter." Because McLaughlin filed her demand during the May term of court, the State was required to try McLaughlin by the end of the July term of court. See OCGA § 15-6-3 (11) (Cobb County Superior Court has six terms of court per year, with those terms beginning on the second Monday in January, March, May, July, September, and November). We note that the jailhouse recordings indicate that trial counsel had undertaken his representation of McLaughlin by early February of 2012. It is unclear, therefore, why counsel waited until late June to file his notice of appearance.

[9] Both Worth and McLaughlin testified at the hearing as to Kovanda's history of physically and verbally abusing McLaughlin.

13

for her abuser. Despite this recognition, however, counsel neither sought a continuance nor withdrew the speedy trial motion in order to seek either a psychiatric evaluation of McLaughlin or expert testimony on BPS.[10]

During trial, defense counsel attempted to qualify Detective Worthington as an expert witness on the issue of BPS, but he found "that [Worthington] was pretty much useless" in that regard. As a result, counsel was unable to present any evidence to explain McLaughlin's statements in her jailhouse conversations with Kovanda in which she took responsibility for injuring Kovanda and which the State used to impeach her. Nor was the defense able to present any evidence to explain why McLaughlin failed to report Kovanda's conduct to the police, why she accepted blame for the situation, or why she continued to express her love for Kovanda. Thus, while trial counsel "tried to invent a battered person's defense" during closing argument, he had no expert testimony to support that theory of defense.

In addition to the testimony of trial counsel, McLaughlin also presented at the motion for new trial hearing the testimony of Dr. Kevin Richards, a forensic psychologist who was qualified as an expert on BPS. Richards had performed a

_____

[10] As discussed more fully below, trial counsel apparently did not seek a continuance because he mistakenly believed he was procedurally barred from doing so.

14

psychological evaluation of McLaughlin to determine, among other things, whether she suffered from BPS, and a copy of his report was submitted into evidence. Dr. Richards opined that McLaughlin was suffering from BPS at the time she committed the offense at issue, and he would testify to that fact at trial, if asked.

According to Richards, while many people may have heard of battered person syndrome, "most people are unfamiliar with the specifics" of the syndrome. A woman suffering from BPS tends to believe that no one can help her, so she does not avail herself of resources that might be offered. Additionally, many battered women remain in an abusive relationship because "they don't perceive themselves as . . . able to extricate themselves from the situation." Such women eventually come to believe that they will suffer abuse no matter what they do, "so they tend to remain in place and accept the abuse." Dr. Richards further testified that victims of abuse "often come to believe that [the abuse] is their fault." Thus, it "is not unusual" for a battered woman to blame herself and take responsibility "for the entirety of the situation." Dr. Richards further explained that it was not unusual "for the primary abuser to cast themselves as the victim" and to convince the victim that she made the abuser violent and that she therefore brought the abuse on herself. Richards stated that McLaughlin's comments in her phone conversations with Kovanda, in which she

15

repeatedly apologized, blamed herself for the situation, and expressed her love for Kovanda, were all consistent with someone suffering from BPS. Additionally, McLaughlin's lying to medical personnel, the police, and other legal authorities in an effort to protect Kovanda were all consistent with BPS.

Dr. Richards further testified that a battered person who has been exposed to repeated episodes of violence may react to aggressive behavior by seeking to defend themselves in a way that may seem out of proportion to the actual threat presented by a particular situation. Such a disproportionate reaction results from the fact that the battered person no longer has the ability to distinguish between threat levels, and so such a person "may take measures that will appear out of proportion to the average person."

After hearing the evidence, the trial court denied McLaughlin's new trial motion in a brief order, stating that McLaughlin had "failed to show that trial counsel's performance was deficient, and that counsel's presentation of the case reflected anything more than reasonable tactics and/or strategy." McLaughlin now appeals from that order.

To prevail on her ineffective assistance claim, McLaughlin was required to prove both that the performance of her lawyer was deficient and that she suffered

16

prejudice as a result of this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SC 2052, 80 LE2d 674) (1984). On appeal, McLaughlin argues that the trial court erred in finding that the performance of her trial counsel was not deficient. In reviewing this claim of error, we will defer to the lower court's factual findings unless clearly erroneous, but we review de novo the court's legal conclusions. *Fedak v. State*, 304 Ga. App. 580, 580 (696 SE2d 421) (2010).

1. We begin with whether McLaughlin's trial counsel rendered deficient performance – i.e., "whether counsel's representation 'fell below an objective standard of reasonableness.'" *Padilla v. Kentucky*, 559 U. S. 356, 366 (III) (130 SCt 1473, 176 LEd2d 284) (2010), quoting *Strickland*, 466 U. S. at 688 (III) (A). Whether defense counsel met the standard of competence required by the United States Constitution "is necessarily linked to the practice and expectations of the legal community: 'The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.'" Id., quoting *Strickland*, 466 U. S. at 688 (III) (A). Whether an attorney has met this standard of reasonableness is one of law, *Gravitt v. State*, 301 Ga. App. 131, 134 (1) (687 SE2d 150) (2009), and in determining this question, "we bear in mind that 'judicial scrutiny of counsel's

performance must be highly deferential.' *Strickland*, 466 U.S. at 689 (III) (A)."

*Arnold v. State*, 292 Ga. 268, 270 (2) (a) (737 SE2d 98) (2013). Thus,

> [t]o demonstrate deficient representation, a convicted criminal defendant . . . must overcome the strong presumption that counsel's performance fell within a wide range of reasonable professional conduct and that counsel's decisions were made in the exercise of reasonable professional judgment. The reasonableness of counsel's conduct is examined from counsel's perspective at the time of trial and under the circumstances of the case.

*Smith v. State*, 302 Ga. App. 128, 133 (2) (690 SE2d 449) (2010) (citation, punctuation and footnote omitted).

In this case, McLaughlin argues that trial counsel performed deficiently when he failed to withdraw the statutory speedy trial demand and seek a continuance so that he could investigate and obtain expert evidence regarding BPS. McLaughlin contends that counsel's conduct in this regard fell below the objective standard of reasonableness because such evidence was crucial to McLaughlin's sole defense of justification. We agree.

(a) To evaluate McLaughlin's claim of ineffective assistance, it is necessary to understand the role that BPS may play in a criminal case. Under Georgia law, a defendant who has suffered previous incidents of domestic violence or child abuse

18

"may offer battered person syndrome evidence to illustrate . . . her reasonable belief in the imminence of the victim's use of unlawful force." *Smith v. State*, 268 Ga. 196, 199 (486 SE2d 819) (1997) (citation omitted). As our Supreme Court has explained,

> evidence that a defendant suffered from battered person syndrome is [a] circumstance which, if believed by the jury, would authorize a finding that a reasonable person, who had experienced prior physical abuse such as was endured by the defendant, would reasonably believe that the use of force against the victim was necessary, even though that belief may have been, in fact, erroneous.

Id. Thus, battered person syndrome "is not a separate defense." Id. Rather, evidence of BPS may be introduced in an appropriate case to support a defendant's claim of justification. Id. "To make a prima facie showing of [justification] based upon [ ] battered person syndrome, a defendant should present the opinion testimony of an expert as well as independent testimony regarding the historical facts upon which the expert relies." *Bishop v. State*, 271 Ga. 291, 293 (3) (519 SE2d 206) (1999) (citations omitted). Specifically, the defendant should present an expert witness to "describe the syndrome, apply that model to the facts shown by the evidence, and opine that the defendant falls within the profile." Id. (citations omitted). A defendant who meets

these evidentiary requirements is entitled to a jury charge on BPS.[11] *Smith*, 268 Ga. at 200.

(b) With this understanding of the role BPS could have played in McLaughlin's justification defense, we turn to the question of whether counsel's failure to request a continuance to pursue the necessary expert testimony constituted deficient performance. As this Court has previously observed, when determining whether trial counsel provided adequate representation, we examine, among other things, whether counsel failed to investigate adequately the facts and/or the applicable law and whether he failed to obtain or present evidence relevant to his client's theory of

---

[11] The charge suggested by the Georgia Supreme Court is as follows:
I charge you that the evidence that the defendant suffers from battered person syndrome was admitted for your consideration in connection with the defendant's claim of self-defense and that such evidence relates to the issue of the reasonableness of the defendant's belief that the use of force was immediately necessary, even though no use of force against the defendant may have been, in fact, imminent. The standard is whether the circumstances were such as would excite the fears of a reasonable person possessing the same or similar psychological and physical characteristics as the defendant, and faced with the same circumstances surrounding the defendant at the time the defendant used force.

*Smith*, 268 Ga. at 200-201.

defense. See *Davis v. State*, 169 Ga. App. 601, (1) (314 SE2d 257) (1984). If counsel did fail in one of these regards, we then ask whether those failures "resulted from inadequate preparation rather than from unwise choices of trial tactics and strategy." Id. (citation and punctuation omitted). See also *Turpin v. Helmeci*, 271 Ga. 224, 226 (518 SE2d 887) (1999) (the right to reasonably effective counsel is violated where trial counsel's omissions result from either inadequate investigation or inadequate preparation rather than from questionable but deliberate and informed strategical decisions). As the United States Supreme Court has explained:

> Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation [into the law and the relevant facts] are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Wiggins v. Smith*, 539 U. S. 510, 521-522 (II) (A) (123 SCt 2527, 156 LE2d 471 (2003) (citation and punctuation omitted). See also *Terry v. Jenkins*, 280 Ga. 341, 346-347 (2) (c) (627 SE2d 7) (2006).

21

Here, counsel testified that McLaughlin's sole defense was justification and that he filed a motion to dismiss based on that defense. After listening to the evidence at the hearing on the motion to dismiss, counsel realized that McLaughlin likely suffered from BPS. Counsel also knew that evidence concerning BPS would provide significant support to the justification defense. Counsel's recognition of these facts, in turn, was based upon his 30-plus years of experience as a criminal defense attorney, during which he had become familiar with battered person syndrome and its use to support a justification defense. Specifically, counsel testified that he knew the elements required to establish BPS and that such proof required expert testimony. Despite this knowledge, however, trial counsel did not request a continuance to investigate whether his client suffered from BPS and/or whether he could obtain expert testimony to support a defense based on BPS.

Notably, counsel's testimony reflects that this decision was not strategic in nature. Rather, it resulted from counsel's mistaken belief that because the hearing on the motion to dismiss occurred immediately before jury selection, it was too late to request a continuance. It further appears that counsel believed that the hearing on the motion to dismiss represented the beginning of trial. Counsel testified that "the trial started before" he learned the facts that would support a battered person defense. He

22

then stated that he tried unsuccessfully to qualify Detective Worthington as an expert witness rather than requesting a continuance and seeking his own expert because "we had already gone over the waterfall" by starting trial. Counsel also testified that the information he learned at the pretrial hearing on the motion to dismiss caused him to change the theory of defense "midstream," after trial had begun.

Based on his understanding of when trial began and the time limits on moving for a continuance, counsel never sought a continuance. Instead, he merely assumed that he could not get one. We find that counsel's assumption in this regard was not reasonable under the circumstances. Despite counsel's belief to the contrary, the law does not specifically limit the time in which a party may move for a continuance. Rather, the law simply provides that "[a]ll applications for continuances are addressed to the sound legal discretion of the court and . . . shall be granted or refused as the ends of justice may require." OCGA § 17-8-22. See also *Gipson v. State*, 297 Ga. App. 413, 415 (2) (677 SE2d 431) (2009) ("[t]he trial judge, in the exercise of his discretion to grant or refuse a continuance, has to consider the facts and circumstances of each case to determine what the ends of justice require") (citation and punctuation omitted). Thus, a trial court may entertain a motion for a continuance made in the middle of trial. See *Bogan v. State*, 206 Ga. App. 696, 700 (5) (426 SE2d

23

392) (1992) (trial court denied a defense motion for a continuance "made during the commencement of trial [but in doing so, the court] expressly informed [defense counsel that] the motion could be renewed later in the trial"); *Stroud v. State*, 176 Ga. App. 300, 301 (2) (335 SE2d 678) (1985) (defense counsel moved for a continuance and the trial court heard evidence on the same "on the very day of trial").[12]

We find that counsel's failure to seek continuance based on his mistaken belief that he was procedurally barred from doing so constituted deficient performance. "An attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, ___ U. S. ___ (II)

___

[12] We recognize that the decision whether to grant a continuance would have rested with the trial court, and there is no guarantee that the trial court would have granted such a motion. See *Gipson*, 297 Ga. App. at 415 (2) ("[a] motion for continuance is addressed to the sound discretion of the trial court") (citation and punctuation omitted). At the same time, however, there is no guarantee that the trial court would have denied such a request. And in the context of an ineffective assistance claim, the question we must determine is whether counsel's failure even to seek a continuance was objectively unreasonable. Moreover, had the trial court denied any request for a continuance, McLaughlin would be able to challenge that ruling on appeal, using much of the same evidence she relied on to prove her ineffective assistance claim. See *Miller v. State*, 303 Ga. App. 422, 424 (693 SE2d 637) (2010) ("to demonstrate that he was harmed by the denial of [a requested] continuance . . . [a defendant must] specifically identify what other evidence or witnesses he would have put forth in his defense if his counsel had been given more time to prepare") (citation and punctuation omitted).

24

(A) (134 SCt 1081, 1088-89, 188 LEd2d 1) (2014) (finding that defense counsel's "failure to request additional funding . . . to replace an expert he knew to be inadequate . . . constituted deficient performance" where the failure resulted from counsel's mistaken belief that he could obtain no additional funds for an expert witness). See also *Ottley v. State*, 325 Ga. App. 15, 22 (2) (752 SE2d 92) (2013) (defense counsel's assumption that a nurse practitioner "would never be allowed to give expert medical testimony was not reasonable" given "well-settled principles of Georgia law," and this failure placed counsel's "performance outside the wide range of reasonable professional conduct").

Our conclusion in this regard is reinforced by the fact that justification was the sole defense that counsel was presenting at trial. Despite this fact, and despite trial counsel's recognition that evidence of BPS would significantly bolster that defense, counsel nevertheless failed to inquire even as to whether a continuance might be possible. Thus, this is "not a case where, after investigation, counsel for the defendant decided to pursue one strategy rather than another but [instead is] a case where counsel's investigation into [his] own theory of the case was entirely inadequate." *Terry*, 280 Ga. at 347 (2) (c) (punctuation omitted). And we have made clear that trial counsel provides inadequate representation where he fails to investigate the law or

25

any evidence that "might be available to assist him in mounting a defense for his client." *Fedak*, 304 Ga. App. at 585 (1) (citation and punctuation omitted). See also *Terry*, 280 Ga. at 347 (2) (c) (deficient performance occurred where counsel's decision to forgo investigating the possibility that someone other than the defendant committed the crime at issue "was neither consistent with professional standards nor reasonable in light of the [available] evidence, . . . evidence that would have caused reasonably competent counsel to investigate further"); *Darst v. State*, 323 Ga. App. 614, 626 (2) (a) (iii) (746 SE2d 865) (2013) ("trial counsel's failure to enlist the services of an expert witness constituted deficient performance," where such evidence was necessary to counter the State's expert testimony and counsel testified "that he simply had not considered the option of using . . . an expert witness at trial"); *Goldstein v. State*, 283 Ga. App. 1, 7-8 (3) (b) (640 SE2d 599) (2006) (same).

2. Having found that trial counsel rendered deficient performance, we now address the question of whether McLaughlin suffered prejudice as a result of trial counsel's representation. "In this regard, [McLaughlin's] burden is to show only a reasonable probability of a different outcome in the trial because of trial counsel's deficient performance, not that a different outcome would have been certain or even more likely than not." *Cobb v. State*, 283 Ga. 388, 391 (2) (658 SE2d 750) (2008)

26

(citation, punctuation, and footnote omitted). And in this context, "'[a] reasonable probability is a probability sufficient to undermine confidence in the outcome [of trial].'" *Miller v. State*, 285 Ga. 285, 286 (676 SE2d 173) (2009), quoting *Strickland*, 466 U. S. at 694.

McLaughlin's sole defense of justification hinged largely on McLaughlin's own testimony. The State, however, was able to impeach that testimony by playing the jailhouse conversations in which McLaughlin apologized to and expressed her love for Kovanda and accepted blame for the incident. As the expert testimony at the hearing on McLaughlin's new trial motion demonstrates, however, evidence of BPS would have explained why McLaughlin accepted blame and why McLaughlin's statements were not inconsistent with her claim of justification. Moreover, evidence of BPS would have entitled McLaughlin to a jury instruction that would have allowed the jury to consider whether, given the nature of her abusive relationship with Kovanda, McLaughlin reasonably believed that his use of force against her was imminent and that she therefore needed to protect herself.

In light of these facts, we find a reasonable probability exists that had counsel sought a continuance to seek expert testimony on the issue of BPS, "that evidence could have influenced the outcome of the trial." *Fedak*, 304 Ga. App. at 586 (1)

27

(citation and punctuation omitted) (defendant prejudiced by defense counsel's failure to investigate whether evidence was available to mitigate his client's intent). See also *Gibbs v. State*, 287 Ga. App. 694, 698 (1) (a) (ii) (652 SE2d 591) (2007) (defendant prejudiced by his lawyer's failure to investigate evidence that alleged victim of child molestation had a history of making false allegations and had a motive for falsely accusing the defendant); *Goldstein*, 283 Ga. App. at 9 (3) (b) (defendant was prejudiced by trial counsel's failure to obtain expert testimony, as that failure left the jury with the impression that the opinions of the State's experts were unassailable).

Given that McLaughlin satisfied both prongs of her ineffective assistance claim, "we must conclude that the trial court erred in denying [her] motion for a new trial." *Fedak*, 304 Ga. App. at 586 (1).

*Judgment reversed. Mercier, J., concurs. Ellington, P. J., concurs in judgment only.*