**FIRST DIVISION**
**BARNES, P. J.,**
**GOBEIL and PIPKIN, JJ.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**https://www.gaappeals.us/rules**

*DEADLINES ARE NO LONGER TOLLED IN THIS COURT. ALL FILINGS MUST BE SUBMITTED WITHIN THE TIMES SET BY OUR COURT RULES.*

**June 29, 2020**

# In the Court of Appeals of Georgia

A20A0527. CRIDER v. THE STATE.

GOBEIL, Judge.

A jury found Cattrina Crider guilty of one count of aggravated assault – family violence, three counts of aggravated battery – family violence, and two counts of possession of a firearm during the commission of a felony, based on her pointing a firearm at and shooting Arnold Kerlin, her boyfriend at the time, in the stomach. Crider appeals from her judgment of conviction and the denial of her motion for new trial, asserting that: (1) trial counsel was ineffective for four distinct reasons; (2) the trial court erred by refusing to instruct the jury on self-defense; and (3) the trial court erred at sentencing by refusing to merge two of her convictions. Crider also filed a supplemental brief asking this Court to consider the cumulative effect of counsel's

errors in addition to the trial court's failure to give the jury charge on self-defense. For the reasons set forth below, we affirm.

> On appeal from a criminal conviction, the evidence must be viewed in the light most favorable to support the verdict, and the defendant no longer enjoys the presumption of innocence; moreover, an appellate court determines evidence sufficiency and does not weigh the evidence or determine witness credibility.

*Williams v. State*, 333 Ga. App. 879, 879 (777 SE2d 711) (2015) (citation and punctuation omitted).

Thus viewed in the light most favorable to the verdict, the record shows that Kerlin and Crider were in a romantic relationship and living together in December 2014. Not long after Crider moved into Kerlin's apartment, Kerlin began to see "red flags" in Crider's behavior, such as severe mood swings and alcohol abuse. Crider and Kerlin both drank regularly during the relationship. The relationship devolved, and Crider began to binge drink and would become violent, including an incident where she punched Kerlin in the mouth. When this happened, Kerlin would leave the apartment. At some point, Kerlin told Crider that he wanted her to move out of the apartment when the lease ended, which made Crider angry.

2

On December 6, 2014, Crider began drinking early in the morning. Kerlin was watching football and drinking beer that afternoon; he estimated that he drank three or four beers over the course of a few hours. Crider continued drinking heavily throughout the day. Around 9 p.m. that evening, Crider began to argue with Kerlin, and Kerlin moved into the bedroom and shut and locked the door to get away from her. Crider kicked the door open, and Kerlin decided to leave the apartment. As he began to collect his things, he noticed that his wallet, keys, and cell phone were not in their normal location. Kerlin believed that Crider had taken them, as she had done in the past.

Kerlin left the bedroom to look for his keys in his coat, which was located in the living room. When he walked back into the bedroom, Crider was kneeling on the floor of the bedroom, with a gun drawn, pointed at Kerlin. Kerlin knew that Crider owned a firearm, but he had never seen her with it in the past. Kerlin did not take her seriously at first, laughed at her, and asked: "[Y]ou're going to shoot me so I can't leave?" Kerlin had a gun of his own that he kept under his mattress, although it was not loaded.[1] Kerlin reached down, picked up his unloaded gun, and asked: "Are we

---

[1] Kerlin kept the gun's magazine in a separate pouch on his side of the bed. He testified that Crider knew that he kept his gun separate from the ammunition.

going to have a shootout now?" He then put his gun on the dresser, telling Crider that she was being ridiculous.

Kerlin "stood there for a minute[]" and asked Crider to give him his keys so that he could leave. Crider did not answer, she "just kept pointing the gun at [Kerlin]" and "kept following [him] around with it." Kerlin went to walk around Crider, to get to his closet, and Crider "put the gun up to [his] stomach and mumbled something along of the lines of you're not going anywhere." Kerlin went to push the gun away, and he heard a "bang" and "knew the gun had gone off." Kerlin did not feel the pain from the gunshot initially, but then he looked down and saw the gunshot wound in his stomach. Crider was immediately upset by what had happened, and fell to the floor with the gun still in her hand. Kerlin began to yell for help and made it out his front door, where he saw his neighbor.

The neighbor, who heard "a help-me kind of a noise[,]" saw Kerlin standing outside the apartment, holding his abdomen and explaining that he had been shot. The neighbor called 911 The officer who responded to the scene found Kerlin with a gunshot wound in his stomach. The officer then saw Crider, whom he described as "hysterical" and "completely out of it, zoned out, and . . . kind of incoherent." The officer believed that she was intoxicated, and he smelled alcohol on her person.

4

Crider told the officer that the shooting was an accident and that Kerlin had pulled the trigger. She also told the officer that Kerlin had grabbed her by the hair and held her down and hurt her head, although she declined medical attention.

The bullet caused injuries to Kerlin's stomach, liver, intestines, and colon. Kerlin later was diagnosed with post-traumatic stress disorder and manic depressive disorder, and is no longer able to work as a result of the incident.

Based on this information, Crider was indicted for one count of aggravated assault – family violence (Count 1), three counts of aggravated battery – family violence (Counts 2, 3, and 4), and two counts of possession of a firearm during the commission of a felony (Counts 5 and 6).

Before trial, the State filed a notice of its intent to introduce evidence of another family violence incident that occurred between Crider and her ex-husband, Bart Beasley, pursuant to OCGA § 24-4-404 (b) and OCGA § 24-4-403. At the hearing, Beasley testified about the incident, which occurred in February 2011, during which Crider "attacked [him]." Crider had consumed a large amount of alcohol, and she followed him around the house, insulting him. Beasley went to use the restroom, and Crider flung the door open and punched him in the face. Beasley wrestled her to the ground, and attempted to retreat, but Crider began to attack him again. Beasley

5

pushed her off of him, and she fell and hit her head on the counter. The confrontation continued, and Crider took Beasley's keys and wallet. Eventually, police arrived at the house and spoke to the couple, but neither was arrested.

Beasley testified that it was common in their marriage for Crider to get intoxicated and physically attack him. During these incidents, Crider had never pointed a gun at him, but she had always owned guns, and had retrieved a gun during arguments. He also explained that she previously had taken away his keys and wallet to keep him from leaving the house.

At the 404 (b) hearing, trial counsel successfully argued that the other acts testified to by Beasley were not relevant to prove lack of accident or mistake, and there was a risk that the jury would improperly consider the evidence as highly prejudicial propensity evidence. The trial court ruled further in Crider's favor that the State could not use the other-act evidence in its case-in-chief to prove her intent. However, the trial court ruled that if Crider put forward a self-defense theory at trial,[2] then the State could introduce this evidence in rebuttal, as it would then become

---

[2] Trial counsel explained at the 404 (b) hearing that she might be pursuing a self-defense theory for trial, and the trial court noted that it would not find a prima facie showing of self-defense absent Crider's testimony.

6

relevant to whether Crider was the primary aggressor and therefore not justified in shooting Kerlin.

At trial, during opening statements, trial counsel explained that the shooting was "a terrible, unfortunate accident, plain and simple." Counsel described Crider's version of events – she and Kerlin were arguing, he became angry, she went into the bedroom to gather some things to leave the house, Kerlin came into the bedroom with his gun drawn, Crider grabbed her gun to defend herself, Kerlin grabbed for her gun, and it accidently discharged. Defense counsel also told the jurors that they would hear testimony from Crider about what happened that night, and they would see evidence that Crider's hand was bruised during the struggle with Kerlin for the gun.

Several witnesses testified for the State, including Kerlin. Kerlin's son also testified that he had witnessed Crider being violent towards his father during their relationship, especially after she had been drinking. After the State rested, the trial court inquired as to whether Crider intended to testify on her own behalf, and defense counsel replied that Crider had not yet decided and wanted to wait until after the other defense witnesses had testified.

Ultimately, the only witness called by the defense was a firearms expert, who testified that there was a shell casing from a bullet that was jammed in Crider's gun,

which was consistent with someone having their hand on top of the gun as it was fired. Trial counsel also admitted into evidence via stipulation a fire department incident report, which stated that Kerlin reported at the scene that he and Crider were "wrestling" when "the gun went off accidentally at point blank range."

Just before the defense rested, the parties discussed whether Crider had made a prima facie showing of a self-defense theory. The State argued that she had not, but if the court ruled that she had, it intended to call Crider's ex-husband Beasley in rebuttal to testify about the incidents where she had been drunk and violent in her previous relationship. Trial counsel contended that Crider had made a showing that would allow the jury to consider the self-defense question. The court stated that it had not seen evidence that would support a justification defense, and Crider had not opened the door that would allow the State to call Beasley as a rebuttal witness. The court reserved its final ruling as to instructing the jury on self-defense, but indicated that it was leaning towards not doing so. The defense then rested without Crider testifying in her own defense.

Over trial counsel's objection, the trial court ruled that it would not instruct the jury on justification/self-defense. Consistent with this ruling, defense counsel did not make an explicit self-defense argument in closing, focusing instead on the accident

defense, although trial counsel did stress that Kerlin also possessed a gun during the incident and reached for her gun as well. She explained in detail that the firearms expert's testimony showed clearly that Kerlin's hand was on the top of Crider's gun when it accidentally went off.

Based on this evidence, the jury found Crider guilty of all charges. At sentencing, the court found that the three aggravated battery convictions merged into a single conviction and the two firearms convictions merged into a single conviction. The court, however, did not merge the aggravated assault conviction with the remaining aggravated battery conviction, although it ran the sentences concurrently. The trial court imposed a total sentence of 25 years with 8 to serve in confinement and the remainder on probation.

Crider filed a motion for new trial, which the trial court denied after a hearing. This appeal followed.

1. In related claims of error, Crider contends that she received ineffective assistance of trial counsel. To prevail on any of these claims, Crider must prove both that her lawyer's performance was deficient and that she suffered prejudice as a result of this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LE2d 674) (1984). "If [Crider] cannot meet [her] burden of proving

either prong of the *Strickland* test, then we need not examine the other prong." *Causey v. State*, 319 Ga. App. 841, 842 (738 SE2d 672) (2013). "The trial court's determination that an accused has not been denied effective assistance of counsel will be affirmed on appeal unless that determination is clearly erroneous." *Johnson v. State*, 214 Ga. App. 77, 78 (1) (447 SE2d 74) (1994) (citations and punctuation omitted).

With respect to the first prong of the *Strickland* test, deficient performance, Crider must show that her attorney performed her duties at trial in an objectively unreasonable way, considering all the circumstances, and in light of prevailing professional norms. *Strickland*, 466 U. S. at 687-688 (III) (A).With respect to the second prong of *Strickland*, to demonstrate that she suffered prejudice as a result of trial counsel's performance, Crider must prove "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U. S. at 694 (III) (B). "This burden, though not impossible to carry, is a heavy one." *Arnold v. State*, 292 Ga. 268, 270 (2) (737 SE2d 98) (2013), citing *Kimmelman v. Morrison*, 477 U. S. 365, 382 (II) (C) (106 SCt 2574, 91 LE2d 305) (1986).

(a) Crider first asserts that trial counsel "seriously mishandl[ed]" the justification defense at trial. She contends that "[t]here was an abundance of evidence that would have supported [] Crider's self-defense theory" at trial, which counsel failed to introduce, including: (1) a report from a doctor that Crider's actions could have been the result of sustained domestic violence or battered person's syndrome; (2) jail records showing that Crider's hand was bruised on the night she was arrested; (3) testimony from Crider's family members that they spoke on the phone with her shortly before the incident, and she did not seem "angry, noticeably drunk, or sad[,]"; and (4) reputation evidence from another family member that Crider was a peaceful person. She argues that she established prejudice, as this evidence could have resulted in a different outcome at trial.

This claim clearly implicates defense counsel's strategic choices concerning what defense to focus on and what evidence to present. See *Hendrix v. State*, 298 Ga. 60, 62 (2) (a) (779 SE2d 322) (2015) ("An attorney's decision about which defense to present is a question of trial strategy.") (citation omitted). "Unless the choice of strategy is objectively unreasonable, such that no competent trial counsel would have pursued such a course, we will not second-guess counsel's decisions in this regard." Id. (citation omitted).

11

Here, counsel's choice of trial strategy was reasonable given the circumstances. At the motion for new trial hearing, trial counsel explained that she intended to put forward both a self-defense theory and an accidental shooting theory at trial, depending on what the evidence showed and whether Crider chose to testify. Indeed, counsel presented both theories in her opening statement, and cross-examined Kerlin about his being angry with Crider, drawing his own gun during the argument, approaching her while she had the gun drawn, and ultimately grabbing her gun. Thus, counsel made efforts to present both theories of defense at trial.

However, what Crider does not seem to recognize are the negative consequences expected had counsel pursued a different trial strategy. The trial court had made clear that if a self-defense theory was advanced, the court would allow the State in rebuttal to offer the other-acts evidence it otherwise had prohibited. Thus, had defense counsel been more emphatic in her presentation of the self-defense theory, the jury would have heard Crider's ex-husband's testimony that Crider had been drunk, aggressive, and violent towards another domestic partner in the past. This evidence also would have been made admissible on cross-examination if defense counsel opened the door and put Crider's character at issue through family members. See *Montgomery v. State*, 350 Ga. App. 244, 246-248 (1) (828 SE2d 620) (2019)

(noting that the State may cross-examine a defendant's character witness about specific instances that are relevant to the trait about which the witness testified on direct). Counsel specifically noted her concern about this kind of evidence at the motion for new trial hearing, showing that she was weighing her options based on the circumstances. Thus it was not unreasonable for counsel to attempt to avoid presenting evidence that would have convinced the trial court to admit the other-acts evidence. See *Hendrix*, 298 Ga. at 61 (1) (a).

Ultimately, if Crider realistically wanted to pursue a justification defense, she would have testified in her own defense. The trial court had explained this to Crider during the pre-trial 404 (b) hearing. On appeal, Crider includes her description of events for the night in question. However, because Crider did not testify, there was not evidence presented at the trial to support her allegation that Kerlin drew his gun before she did or made any overt violent threats or actions that would have caused her to fear for her life.[3] Nor could there be, as there were only two witnesses to the shooting, and Kerlin was the only one who testified. See *Hunter v. State*, 281 Ga. 693, 694-695 (2) (642 SE2d 668) (2007) (self-defense theory was not supported by the

---

[3] See *Ford v. State*, 306 Ga. App. 606, 610 (20 (703 SE2d 71) (2010) ("facts alleged in briefs but unsupported by evidence in the record cannot be considered on appeal") (citation and punctuation omitted).

evidence, where defendant did not testify and there was no evidence that defendant had to shoot victim to avoid death or great bodily injury); *Brunson v. State*, 293 Ga. 226, 227-228 (2) (744 SE2d 695) (2013) (self-defense theory was not supported by the evidence, where victim moved toward defendant and reached for defendant's gun hand only in response to defendant's threatening victim with a gun).

Because Crider had not made her decision as to whether to testify when the trial began, counsel was forced to walk a fine line – she wanted to avoid the other-act evidence coming in to prevent a "character assault" by the State. Counsel also attempted to lay the foundation for a justification defense throughout the State's case, in the event that Crider chose to testify and the defense pivoted toward the self-defense theory. Given these circumstances, we conclude that the trial court did not clearly err in determining that counsel was not deficient with respect to her presentation of Crider's defense at trial. See *Boyd v. State*, 275 Ga. 772, 776 (3) (573 SE2d 52) (2002) (in assessing whether counsel's performance was reasonable, "[w]e ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted") (citation omitted).

As to the specific evidence pointed to by Crider not already addressed, Roberta Ballard, Ph. D., a licensed clinical psychologist evaluated Crider after the trial.

14

Ballard testified at the motion for new trial hearing that Crider reported being the victim of domestic violence throughout her life, including in her relationship with Kerlin, and it was not uncommon for victims to retaliate with violence. She also testified that Crider exhibited symptoms consistent with a battered person, who might lash out at her abuser. Crider argues that defense counsel was deficient for failing to get Crider evaluated before trial, and presenting this kind of evidence to the jury. Crider relies heavily on *McLaughlin v. State*, 338 Ga. App. 1, 13-14 (1) (b) (789 SE2d 247) (2016), in which we held that trial counsel was ineffective for failing to seek a continuance of the defendant's trial to investigate and obtain expert evidence regarding battered person syndrome.[4]

Crider's trial counsel explained at the motion for new trial hearing that she was aware of Crider's past of abusive relationships, but she did not believe that Crider needed to be evaluated for a battered person syndrome defense. As explained above, if defense counsel had attempted to put forward this kind of evidence, the trial court likely would permit the State to introduce evidence that Crider had been the primary aggressor in a past relationship. Thus, the jury would have heard evidence

---

[4] Our holding in *McLaughlin* was based on counsel's mistaken belief that it was too late in the proceedings to seek a continuance, rather than any strategic decision by counsel concerning the battered person defense. 338 Ga. App. at 13-14 (1) (b).

15

contradicting Crider's report of domestic abuse. Moreover, counsel's actions were again constrained by Crider's choice not to testify, as battered person syndrome is only a viable defense "to support a defendant's claim of justification." *McLaughlin*, 338 Ga. App. at 10 (1) (a).

Additionally, unlike the defendant in *McLaughlin*, Crider had a reasonable alternative defense to pursue in this case – accident. Indeed, counsel put forward evidence that supported the theory that Crider retrieved her gun only as a precaution, and it fired only when Kerlin approached her and attempted to move the gun. The fact that the jury did not believe this theory does not mean that counsel's actions were unreasonable. See *Deleon-Alvarez v. State*, 324 Ga. App. 694, 712 (9) (751 SE2d 497) (2013) ("[T]he fact that the trial counsel chose to try the case in the manner in which it was tried and made certain difficult decisions regarding the defense tactics to be employed with which appellant and [her] present counsel now disagree, does not require a finding that the representation below was so inadequate as to amount to a denial of effective assistance of counsel.") (citation and punctuation omitted). Thus, we conclude that counsel's actions were not so unreasonable as to amount to ineffective assistance of counsel.

Finally, we do not agree that the other evidence highlighted by Crider supports a reversal of the trial court's ruling on her motion for new trial. Trial counsel testified at the motion for new trial hearing that she did not recall admitting into evidence a photograph showing that Crider's hand was bruised on the night of the incident. Crider argues that this photograph would have supported the theory that Kerlin wrestled with her for the gun, justifying her shooting of him. However, defense counsel presented other evidence of this theory, by having the firearms expert testify that someone's hand was on top of the gun when it fired, and by introducing the fire department incident report, which stated that Kerlin had reported at the scene that he was "wrestling" with Crider when the gun discharged.

Further, Crider argues that counsel should have called her family members as defense witnesses. At the motion for new trial hearing, Crider's sister-in-law testified that she spoke to Crider on the evening of the shooting, and she did not notice anything "out of the ordinary" about Crider's demeanor, which she described as calm and "normal." Crider's brother was also on the phone call, but he was driving so he was not "much into the conversation." He also believed that Crider's demeanor was normal. When asked about why she did not call these witnesses at trial, trial counsel repeated that she was concerned about putting Crider's character at issue, which

17

would allow the State to introduce evidence of Crider's character for not being peaceful. Given the circumstances described above, we conclude that this decision was not objectively unreasonable.

Additionally, at trial, Kerlin testified as to Crider's emotional state with him just before the shooting, which was more relevant to the issue of Crider's guilt than her emotional state when talking to family members before her argument with Kerlin. Thus, Crider has failed to show that this testimony was reasonably likely to have changed the outcome of her trial.

(b) Closely related to her first claim, Crider asserts that counsel failed to properly advise her concerning her decision not to testify at trial. Specifically, Crider asserts that she did not understand that she would lose her ability to advance a self-defense theory without testifying. This claim is belied by the record.

"The decision whether or not to testify is a tactical one made by the defendant [herself] after consultation with counsel. The choice of whether to testify is ultimately a defendant's." *Collins v. State*, 300 Ga. App. 657, 661 (5) (686 SE2d 305) (2009) (citation and punctuation omitted).

Trial counsel testified at the motion for new trial hearing that she had several "very long conversations" with Crider about testifying, but ultimately left the decision

up to Crider. She also informed Crider about "what would happen if [Crider] did testify versus what would happen if she didn't testify." This testimony is also supported by trial counsel's statement at trial that she "fully informed [Crider] of her rights vis-a-vis the right to testify and what the jury instructions would be were she not to testify."

Additionally, at the 404 (b) hearing, the trial court had explained that it was unlikely to allow a justification defense to go to the jury without Crider's testimony. And during the trial, just before the evidence closed, the trial court informed the defense that it had not yet seen sufficient evidence to support a self-defense jury instruction. Trial counsel then consulted with Crider, and upon returning, informed the court that Crider would not be testifying. Thus, the record shows that Crider was informed about the consequences of not testifying. Accordingly, we affirm the trial court's ruling that counsel was not deficient in this regard, as the record supports the trial court's conclusion that Crider made her own decision not to testify after being advised of the consequences. See *Collins*, 300 Ga. App. at 661-662 (5) (defendant's claim that he was not adequately advised by counsel about his right to testify was belied by counsel's testimony at the motion for new trial hearing and by the trial court's discussion with defendant at trial); *Felder v. State*, 286 Ga. App. 271, 278

19

(648 SE2d 753) (2007) (counsel's advice that defendant should not testify because he would be vulnerable on cross-examination if he did was reasonable strategic decision).

Relevant to this enumeration of error, Crider also claims that the trial court improperly credited trial counsel's testimony from the motion for new trial hearing. Crider refers to a motion filed after the hearing in which she sought to re-open the evidence. Crider alleged that she had evidence that contradicted some of trial counsel's testimony from the motion for new trial hearing. In its order denying Crider's motion to re-open the evidence, the trial court noted that it had forwarded the motion to trial counsel because trial counsel was not included on Crider's certificate of service. The trial court inquired whether trial counsel wished for the evidence to be re-opened, and she did not.

Crider argues that, based on this ex parte communication between the trial court and trial counsel, we should not give any deference to the trial court's credibility determinations. However, as explained above, trial counsel's testimony at the motion for new trial hearing regarding her discussions with Crider about her decision whether to testify are supported by the record, and thus we conclude that the trial court's decision to credit counsel's testimony in this regard was not clearly

20

erroneous. See *Perdue v. State*, 298 Ga. 841, 845 (3) (785 SE2d 291) (2016) (an appellate court is to "accept the trial court's factual findings and determinations regarding credibility unless they are clearly erroneous") (citation omitted). We find no reversible error on this issue.

(c) Crider next asserts that counsel was ineffective for failing to investigate the State's claim that she had been the primary aggressor in her previous marriage and rebut such claim with court documents. Specifically, she asserts that the State's threat to introduce Beasley's testimony about their prior domestic violence incidents was hollow, as it could have been rebutted with evidence that would have showed that she was not the primary aggressor in their marriage. Thus, Crider contends that such evidence would have diminished the harm of Beasley's testifying, and Crider could have testified to her self-defense theory without concern that Beasley's testimony would greatly damage her defense.

However, although Crider argues that defense counsel could have uncovered this evidence, including a temporary protection order ("TPO") awarded to Crider against Beasley, defense counsel testified at the motion for new trial hearing that Crider gave her the file from her divorce and "[t]here was nothing in the file . . . that would help" the defense. When asked if she was aware of Crider's TPO against

Beasley, defense counsel could not recall, and stated that the TPO and other protective order documents were not in the information given to her by Crider. Thus, given defense counsel's testimony that she was unaware of the additional information concerning Beasley and that Crider did not supply trial counsel with this information, the trial court's finding of no ineffective assistance was not clearly erroneous. See *Gordon v. State*, 252 Ga. App. 133, 135 (2) (555 SE2d 793) (2001) ("Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information.") (citation omitted).

(d) Crider also claims that counsel was ineffective for failing to impeach Kerlin on three pieces of his testimony. First, she argues that Kerlin's testimony that "he did not drink to the point of excess" could have been impeached with a record of his 2007 DUI conviction. However, Crider does not cite to where in the record Kerlin made such a statement. To the contrary, although Kerlin testified that he usually drank "in moderation[,]" he also admitted that he drank regularly during the relationship and was drinking on the day of the incident. On cross-examination, Kerlin again admitted to regularly drinking beer and wine. On this issue, trial counsel explained that she did

22

question Kerlin about his drinking, but did not attempt to impeach him by using his DUI conviction. Given the facts as actually testified to by Kerlin, we conclude that counsel's cross-examination strategy was not unreasonable. See *Herdon v. State*, 235 Ga. App. 258, 259 (509 SE2d 142) (1998) (noting that the extent of cross-examination is "within the realm of trial tactics and strategy, and usually provide no basis per se for a reversal of appellant's conviction") (citation and punctuation omitted).

Second, Crider claims that Kerlin's testimony that Crider "did not contribute to the household expenses" could have been impeached by producing a check from Crider to Kerlin for hundreds of dollars. Again, Crider provides no record citation for the testimony she is contesting. During Kerlin's cross-examination, he testified that Crider did not have a job, and he was "pulling the financial weight in the relationship." However, these statements came in response to trial counsel's questions about Kerlin's dissatisfaction with Crider as a partner, which trial counsel was attempting to use as a way to argue that Kerlin started the argument that led to the shooting, making him the primary instigator that night. This decision was an issue of trial strategy, which we conclude was not unreasonable given the facts in this case.

Finally, Crider claims that Kerlin's testimony that Crider was angry and drunk on the night of the incident could have been impeached with testimony from Crider's family members that she was not drunk or angry earlier that day. As explained in Division 1 (a) above, we conclude that Crider has failed to show that counsel's actions were objectively unreasonable, or that having her family members testify about her mindset before the shooting would have changed the outcome of the trial. Accordingly, we find no merit to this claim of ineffective assistance.

2. Crider next asserts that the trial court erred in refusing to instruct the jury on self-defense. She argues that some evidence supported this jury instruction, including Kerlin's possession of weapons, the size disparity between Kerlin and herself, and that he aggressively approached her that night demanding that she leave the house. Additionally, Crider argues that, despite the trial court's insistence that she testify to support a self-defense jury instruction, such is not required in Georgia.

"To authorize a requested jury instruction, there need only be slight evidence supporting the theory of the charge. Whether the evidence presented is sufficient to authorize the giving of a charge is a question of law." *Garner v. State*, 303 Ga. 788, 790 (2) (815 SE2d 36) (2018) (citation and punctuation omitted). "[A] person is justified in using force which is intended or likely to cause death or great bodily harm

24

only if he or she reasonably believes that such force is necessary to prevent death or great bodily injury to himself or herself or a third person or to prevent the commission of a forcible felony." OCGA § 16-3-21 (a).

In this case, Crider "has pointed to no evidence to support a reasonable belief that shooting the victim was necessary to defend [her]self . . . from any imminent use of unlawful force." *Garner*, 303 Ga. at 790 (2); see also *Hunter*, 281 Ga. at 694 (2) ("To establish justification, a defendant must show the circumstances were such as to excite the fears of a reasonable person that [her] safety was in danger.") (citation and punctuation omitted); *Bruson v. State*, 293 Ga. App. 226, 227-228 (2) (744 SE2d 695) (2013) (although a defendant is not required to testify in support of a justification defense, trial court must look at evidence admitted at trial to determine whether justification instruction is warranted). Although she and Kerlin were engaged in an argument before the shooting, nothing in the record suggests that Crider was in danger of imminent violence when she retrieved her gun and pointed it at the victim. Nor was there evidence that she was in danger of imminent violence when she fired the gun. Although Kerlin retrieved his unloaded firearm to defend himself from Crider's initial assault, the record supports that his response to her was not aggressive and that he did not point his weapon at her.

25

To the contrary, there was evidence presented that Crider was the initial aggressor on the night of the shooting, as Kerlin testified that she retrieved her gun when he stepped out of the bedroom, and she pointed it at him when he reentered the room. Accordingly, where the evidence shows that the defendant is the aggressor, no self-defense instruction is required. *Garner*, 303 Ga. at 790-791 (2). See also OCGA § 16-3-21 (b) (3) (a person is not justified in using force if she "[w]as the aggressor . . . unless [s]he withdraws from the encounter and effectively communicates to such other person [her] intent to do so"). Thus, the trial court's decision not to give a justification instruction was not reversible error.

3. Crider also asserts that the trial court erred in refusing to merge Count 1, the aggravated assault conviction, with Count 2, the aggravated battery conviction, as there was no deliberate interval between the two criminal acts. We disagree.

"Whether offenses merge is a legal question, which we review de novo." *Regent v. State*, 299 Ga. 172, 174 (787 SE2d 217) (2016) (citation omitted). To avoid merger, "a deliberate interval must exist between the completion of one criminal act and the start of a separate criminal act." Id. (citation omitted).

Count 1 of Crider's indictment charged her with one count of aggravated assault, based on her pointing the firearm at Kerlin. Counts 2, 3, and 4 charged her

26

with aggravated battery based on harm caused to Kerlin's stomach, liver, and colon, respectively, from the gunshot fired by Crider. As explained above, the trial court ruled that the three aggravated battery convictions would merge into one conviction, but that the aggravated assault conviction would not merge with the combined aggravated battery conviction.

In *Regent*, we explained that aggravated assault and aggravated battery can merge because, although the two offenses are established by proof of different facts, an aggravated assault count can be considered to be included in an aggravated battery count, when they are based on a "single criminal act[.]" 299 Ga. at 175-176; see also OCGA § 16-1-6 (2) (providing that one crime is included in another, if that crime charged differs from the other "only in the respect that a less serious injury or risk of injury to the same person . . . suffices to establish its commission). However, the crimes charged in *Regent* were based on one continuous criminal act, wherein the defendant "straddled his girlfriend, slashed her throat and, almost immediately thereafter . . . cut her again." 299 Ga. at 174, 176.

The facts in *Regent* are distinguishable from the ones present here. At trial, Kerlin testified that Crider pointed the gun at him for an extended period of time, following him as he moved around the bedroom. They had a conversation, and Crider

27

continued to follow him, before eventually aiming the gun at his stomach and firing the weapon. These facts show that the aggravated assault was completed before the battery took place. See OCGA § 16-5-21 (a) (2) (defining assault with a deadly weapon); OCGA § 16-5-21 (k) (2015) (defining family violence aggravated assault). Thus, there was a deliberate interval between Crider's aggravated assault and her aggravated battery. Compare *Lowe v. State*, 267 Ga. 410, 412 (1) (b) (478 SE2d 762) (1996) (malice murder count did not merge with aggravated assault count because the aggravated assault was completed, and there was an ensuing interval where defendant walked around the car before aiming and firing fatal shot at victim), with *Ingram v. State*, 279 Ga. 132, 133 (2) (610 SE2d 21) (2005) (where no deliberate interval exists between assault and another criminal acts, assault conviction must merge with other conviction).

4. Finally, Crider filed a supplemental brief citing the Supreme Court's recent decision in *State v. Lane*, __ Ga. __ (838 SE2d 808) (2020, which held that reviewing court should consider collectively the prejudicial effect of trial court errors and deficient performance by counsel – at least where those errors involve evidentiary issues). Specifically, Crider asks us to consider the cumulative effect of counsel's errors. However, nothing in *Lane* has changed our analysis where we have found no

28

examples of ineffective assistance of counsel. See __ Ga. __ (1), (4) (838 SE2d at 812-813, 817-818) (explaining that we will consider cumulative effect of counsel's errors when counsel was deficient in two distinct respects and the trial court committed at least one evidentiary error). Accordingly, where Crider has failed to show error, she has likewise failed to show cumulative error. *Koonce v. State*, 305 Ga. 671, 678 (2) (f) n.3 (827 SE2d 633) (2019). Thus, we conclude that the trial court did not err in denying Crider's motion for new trial.

*Judgment affirmed. Barnes, P. J., and Pipkin, J., concur.*