## A10A0926. FEDAK v. THE STATE.
(696 SE2d 421)

BLACKBURN, Judge.

Following a jury trial, Jason Fedak was convicted of a single count of violating Georgia's peeping Tom statute, OCGA § 16-11-61. He now appeals from the denial of his new trial motion, asserting that he received ineffective assistance of counsel because his trial attorney: (i) failed to prepare or present any evidence in support of his sole defense, that he lacked the requisite intent to spy upon the victim; (ii) failed to request a jury instruction on the lesser included offenses of loitering and prowling; and (iii) failed to object to the State's leading questions during direct examination of the victim, thereby allowing the State to introduce substantive evidence that prejudiced him. Under the facts of this case, we are constrained to find that trial counsel's failure to investigate what evidence was available to support Fedak's defense and his subsequent failure to present any such evidence at trial rendered him ineffective. Specifically, we find that while the State proved that Fedak engaged in the conduct at issue, the evidence which trial counsel failed to investigate or present may have been sufficient to create a reasonable doubt as to whether Fedak engaged in that conduct for the purpose of spying on the victim. We therefore reverse the trial court's order.

> To prevail on a claim of ineffective assistance of trial counsel, a defendant bears the burden of showing both that trial counsel was deficient and that he was prejudiced by the deficiency. The trial court's factual findings with respect to effective assistance of counsel will be affirmed unless clearly erroneous, but we review the trial court's legal conclusions de novo.

(Citation omitted.) *Gibbs v. State*.[1]

Viewed in the light most favorable to the verdict, *Culver v. State*,[2] the record shows that the victim in this case was a then-16-year-old girl who lived in a house across the street from Fedak's home. The girl's bedroom was at the front of the house, and had two large windows that faced the front yard; one of those windows was covered only by a sheer, white curtain. Between 10:30 and 11:00 on the night of August 19, 2008, the girl was in her bedroom, lying on the bed and watching television. She turned toward the windows because she sensed that someone was there. Through the sheer window covering, the girl saw the face of a man with dark hair and wearing a white

---

[1] *Gibbs v. State*, 287 Ga. App. 694, 696 (1) (652 SE2d 591) (2007).

[2] *Culver v. State*, 290 Ga. App. 321 (659 SE2d 390) (2008).

YALE LAW LIBRARY

t-shirt. She turned away, and then began to sit up slowly. As she did so, she turned back toward the window, but the man was gone. The girl then went and woke her parents, who called police.

When police arrived, the girl's parents met them in the driveway. While talking with police, the mother spotted a shadowy figure rounding the corner of a house two doors down the street. A police officer went to investigate and found Fedak hiding underneath a dump truck parked in the driveway of that house. Fedak initially failed to respond to the officer, but eventually complied with his command to come out from under the truck. In response to the officer's questions, Fedak stated that he was hiding because he was playing a game. He admitted that he had been at the neighbor's house, but stated that he had merely gone over to say hello. Fedak explained that when he got to the house he saw that the daughter's light was the only one on and, realizing how late it was, he left. Police arrested Fedak, and he was subsequently indicted on a single count of peeping Tom.

Prior to trial, Fedak's attorney negotiated a plea agreement where, in exchange for Fedak's guilty plea, the State would request a probated sentence. The trial judge, however, refused to accept Fedak's guilty plea because, in response to questions from the court, Fedak insisted that he had not gone to his neighbor's house to spy on the victim. In other words, Fedak did not admit he was guilty of being a peeping Tom. The parties selected a jury immediately after the trial court rejected Fedak's guilty plea, and the case proceeded to trial the next morning.

The evidence at trial established that Fedak and his family had lived across the street from the victim and her family for approximately seven years. Until the incident in question, the families had a good relationship, frequently visiting one another's homes. The victim had babysat for Fedak's children and her younger sister was friends with Fedak's young daughters and had spent the night at the Fedak home. There was no evidence that Fedak had a criminal record or any history of lewd or lascivious behavior. The victim and her parents all characterized Fedak's behavior on the night in question as "strange," "odd," and "unusual" — i.e., out-of-character for Fedak. Similarly, the arresting officer testified that in his opinion, Fedak was "acting strange," noting that Fedak's speech was slowed and that he kept repeating himself.

Fedak testified that on the night in question he had been working in his garage when it occurred to him that he wanted to ask the victim something about his own teenage son. Specifically, Fedak explained that his ex-wife had called him earlier that day and told him their teenage son was smoking cigarettes. Because the victim and Fedak's son were longtime friends, Fedak thought that the

582

victim might know where his son was getting cigarettes. As Fedak reached the end of his driveway en route to the victim's house, he noticed the victim's bedroom lights were on. Rather than walking up the neighbors' driveway as he normally would, he took a shortcut through their yard, walking directly toward the victim's bedroom windows. Fedak planned to knock on the girl's window and see if she would open it and speak to him. As he approached the window, Fedak saw the victim move, and it occurred to him how late it was and that "he shouldn't be there," so he left. Fedak admitted that, rather than proceeding directly back to his house, he began to walk around the block so that he could approach his residence through his back yard. He further explained that he took this route to avoid being detected, because he realized that the victim had seen him and how his conduct could be misconstrued. Fedak also admitted that he hid from the police, explaining that he thought if no one saw him "this would go away."

When asked why he had not explained these facts to the police, Fedak testified that he had short-term memory problems and consequently, at the time police questioned him, he could not remember why he had gone over to his neighbors' house. He recalled his motive for going to speak with the victim several hours later, explaining: "It wasn't until sitting in jail that night that the rest of the things caught up to me and [I] remembered why I was there [at the neighbors' house] to begin with."

Following his conviction, Fedak moved for a new trial, asserting he received ineffective assistance of counsel. At the hearing on that motion, Fedak introduced evidence showing that he suffers from multiple sclerosis ("MS"), a disease of the central nervous system that affects the brain and spinal cord. Fedak's neurologist, Dr. Hormes, testified that he had treated Fedak for the disease since his diagnosis in 2006. According to Dr. Hormes, symptoms of MS can include short-term memory loss and impeded judgment. MS patients can have trouble discerning the time of day and can become confused as to time, location, and people, similar to those suffering from Alzheimer's disease. Both fatigue and stress can make these symptoms worse, and they would also affect an MS patient's verbal and emotional responses to situations and questions.

Dr. Hormes testified that during his treatment of Fedak he had observed shrinkage of Fedak's brain and changes in his personality. When he saw Fedak approximately one month before the incident at issue, Dr. Hormes observed a decline in his cognitive abilities that the physician found "really worrisome." The doctor found particularly disturbing what he believed to be Fedak's poor judgment. As a result of his concerns, Dr. Hormes had referred Fedak for a psychological evaluation, which was done in September 2008, approxi-

mately one month after the incident which resulted in Fedak's conviction. The psychological evaluation confirmed that Fedak had short-term memory loss, would have difficulty expressing himself verbally, and might have a hard time giving accurate responses to questions.

Dr. Hormes had reviewed Fedak's trial testimony and, in his opinion, that testimony reflected Fedak's limited and deteriorating cognitive abilities. He further noted that Fedak's testimony would have been adversely impacted not only by the stress of trial, but also by fatigue. Fedak did not take the stand until approximately 4:45 p.m., after having been in court since early that morning. Dr. Hormes also testified that he had spoken with Fedak's wife about testifying at trial and that he was willing to do so, but that he was never contacted by Fedak's attorney.

Fedak's trial counsel testified that although he had been retained approximately one week after the incident, he did not prepare the case until the night before trial, after striking a jury. Given that Fedak admitted his presence in the neighbors' yard, the defense was that Fedak lacked the requisite criminal intent — i.e., he did not go into the yard or approach the victim's window for the purpose of spying on the victim. Despite this theory, trial counsel introduced no evidence to show either that Fedak suffered from MS or the potential effects of that disease on Fedak's cognitive abilities. Indeed, it does not appear that trial counsel ever spoke with a medical professional even to confirm that his client suffered from MS. At the plea hearing, counsel merely told the trial court that Fedak "seems to think that he has MS."

Although Fedak told him that he wanted his neurologist to testify at trial, counsel did not contact the doctor. When asked why, counsel gave several explanations for this behavior. He first testified that he did not contact Dr. Hormes because of the plea agreement — i.e., he was not expecting the case to go to trial. Counsel later acknowledged, however, that he had actually discouraged the idea of calling Dr. Hormes to testify, stating that he asked Fedak, "Is that doctor going to testify that MS makes you stupid?"[3] Trial counsel also told Fedak's wife that if she wanted to contact the doctor and arrange for him to come to trial, counsel would "put him on the stand." (Trial counsel was apparently willing to call Dr. Hormes as a witness without ever having spoken with him or preparing a direct examination of him in advance.)

---

[3] Ironically, had counsel spoken with Dr. Hormes, he would have learned that while he may not have testified that Fedak's MS made him "stupid," he would have explained that the MS had adversely affected Fedak's cognitive abilities.

Counsel testified that he did not obtain a copy of Fedak's September 2008 psychological evaluation until after trial and that, although he "did not really understand what parts of the report meant," he did not think the report would have helped him at trial.

The trial court concluded that trial counsel "certainly could have done more. . . . And many times [trial counsel] might have done more in the context of this case. [But counsel] expected [it] to be a plea." The trial court nevertheless denied Fedak's new trial motion, finding that trial counsel's overall performance was not deficient and that Fedak failed to show he was prejudiced by trial counsel's errors. Fedak now appeals from the trial court's order.

1. To convict Fedak of being a peeping Tom, the State was required to prove that he was peeping through his neighbors' window "for the purpose of spying upon or invading the privacy of the [victim]." OCGA § 16-11-61 (b). As trial counsel acknowledged, given that Fedak admitted his presence in his neighbors' yard, near their daughter's windows, the sole defense theory was that Fedak was not there for the purpose of spying on the daughter. On appeal, Fedak argues that trial counsel's failure either to investigate or to present any evidence in support of this defense rendered him ineffective. Specifically, Fedak claims that trial counsel should have put on evidence of his MS and its effect on his cognitive abilities, because such evidence would have allowed the jury to find that he lacked the intent required for a peeping Tom conviction. Without such evidence, the only conclusion the jury could draw is that Fedak was present in his neighbors' yard for the purpose of spying on the victim.

In evaluating a claim of ineffective assistance of counsel, "we generally presume that trial counsel's decisions were made in the exercise of reasonable professional judgment." (Punctuation omitted.) *Johnson v. State*.[4] "[R]easonable professional judgment[, however,] requires proper investigation." *Turpin v. Helmeci*.[5] "[A]lthough counsel is not obliged to investigate all information provided by a defendant or all potential theories of the case, counsel is obliged to conduct a reasonable investigation." *Gravitt v. State*.[6] See also *Gibbs*, supra, 287 Ga. App. at 696 (1) (a) (i) ("[i]n representing a client, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary") (punctuation omitted.) Thus, "[t]he right to reasonably effective counsel is violated when the omissions charged to trial counsel resulted from inadequate preparation rather than from

---

[4] *Johnson v. State*, 284 Ga. App. 147, 149 (2) (643 SE2d 556) (2007).

[5] *Turpin v. Helmeci*, 271 Ga. 224, 226 (518 SE2d 887) (1999).

[6] *Gravitt v. State*, 301 Ga. App. 131, 133 (1) (687 SE2d 150) (2009).

unwise choices of trial tactics and strategy." (Punctuation omitted.) *Turpin*, supra, 271 Ga. at 226.

In addition to acknowledging that lack of intent was Fedak's sole defense, trial counsel also testified that Fedak's story about why he had gone to his neighbors' house sounded "stupid." Although Fedak's testimony represented the only defense evidence trial counsel presented, he did not think a jury would find it believable, particularly in light of the fact that Fedak fled after being seen by the victim. Thus, trial counsel's frank assessment of the case was that Fedak's testimony, standing alone, would not support the defense theory. Despite this assessment, however, and despite trial counsel's knowledge that Fedak had MS and that he wanted his neurologist to testify at trial, trial counsel did not contact Dr. Hormes or otherwise investigate how or whether Fedak's MS could support his defense. Indeed, trial counsel did all he could to discourage Fedak and his wife from using Dr. Hormes as a witness, even though trial counsel had done no investigation to support this advice.

Notably, trial counsel's testimony reflects that his decisions and actions in this regard "were not the result of strategic decisions or trial tactics. Rather, they resulted from trial counsel's failure to investigate what facts and evidence might be available to assist him in mounting a defense for his client and from his failure to prepare adequately for the trial." *Johnson*, supra, 284 Ga. App. at 151 (2). Trial counsel's failure to investigate what evidence might be available in support of Fedak's sole defense rendered him ineffective. See id. See also *Gibbs*, supra, 287 Ga. App. at 696 (1) (a) (i) ("[w]here a failure to investigate results from inattention and not from reasoned strategic judgment, however, it is unreasonable as a matter of law") (punctuation omitted); *Goldstein v. State*;[7] *Gibson v. State*.[8]

We further find that Fedak has demonstrated prejudice resulting from trial counsel's actions. "Such prejudice is shown by demonstrating that a reasonable probability exists that the outcome of the case would have been different but for the deficient performance of counsel." (Punctuation omitted.) *Gibbs*, supra, 287 Ga. App. at 698 (1) (a) (ii). Although the neurologist's testimony would not have required the jury to acquit Fedak, his "burden [here] is to show only a reasonable probability of a different outcome, not that a different outcome would have been certain or even more likely than not." (Punctuation omitted.) *Bass v. State*.[9] See also *Miller v. State*[10]

---

[7] *Goldstein v. State*, 283 Ga. App. 1, 6 (3) (a) (640 SE2d 599) (2006).
[8] *Gibson v. State*, 280 Ga. App. 435, 437 (634 SE2d 204) (2006).
[9] *Bass v. State*, 285 Ga. 89, 93 (674 SE2d 255) (2009).
[10] *Miller v. State*, 285 Ga. 285, 286 (676 SE2d 173) (2009).

("[t]he question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt") (punctuation omitted).

We find that Dr. Hormes's testimony and the September 2008 psychological assessment of Fedak, if credited by the jury, could have created a reasonable doubt as to whether Fedak was in his neighbors' yard to spy on the victim. The State's argument at trial was that, given Fedak's lack of any reasonable explanation for his presence at the scene and his attempted flight from police, the only logical conclusion to be drawn from the evidence was that Fedak was a peeping Tom. Evidence of Fedak's MS and its impact on his cognitive abilities, however, would have countered the State's theory of the case and could be sufficient to create a reasonable doubt as to Fedak's intent and, therefore, his guilt. This evidence could have been particularly effective in light of the other evidence showing that Fedak's conduct on the night in question was out-of-character for him. Such evidence would also have bolstered Fedak's testimony that he did not realize the late hour when he approached his neighbors' house, his testimony concerning his short-term memory problems, and his explanation for why his response to questions from police differed from his trial testimony.

"Based on the facts of this case, a reasonable probability exists that had trial counsel investigated [Fedak's MS and its impact on his cognitive abilities and presented evidence] regarding the same, that evidence could have influenced the outcome of the trial." (Punctuation omitted.) *Gibbs*, supra, 287 Ga. App. at 698 (1) (a) (ii). In short, "[a] reasonable possibility . . . exists that had trial counsel's performance not been deficient, the outcome of the trial would have been different." *Goldstein*, supra, 283 Ga. App. at 9 (3) (b). See *Gravitt*, supra, 301 Ga. App. at 137 (2) (defendant prejudiced by trial counsel's failure to introduce available evidence that would have supported sole theory of defense); *Gibson*, supra, 280 Ga. App. at 437-438 (same). Accordingly, we must conclude that the trial court erred in denying Fedak's motion for a new trial.

2. In light of our holding in Division 1, we need not address Fedak's remaining claims of error.

*Judgment reversed. Barnes, P. J., and Bernes, J., concur.*

DECIDED JUNE 11, 2010 —
RECONSIDERATION DENIED JUNE 25, 2010.

*H. Maddox Kilgore, Kimberly K. Frye*, for appellant.

*Garry T. Moss, District Attorney, Patricia G. Hull, J. Clifford Head, Assistant District Attorneys*, for appellee.