**FOURTH DIVISION**
**ELLINGTON, P. J.,**
**BRANCH and MERCIER, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**March 15, 2017**

# In the Court of Appeals of Georgia

A16A2019. SHAW v. THE STATE.

BRANCH, Judge.

Following a trial by jury, Kenneth Justen Shaw was convicted of aggravated battery and aggravated assault but acquitted of obstruction of an officer, charges that arose out of a fight at a Waffle House in Forsyth; he was sentenced to 10 years in prison followed by 10 years of probation. On appeal from the denial of his motion for new trial, Shaw contends that the evidence was insufficient to support the conviction of aggravated battery. He further contends that the trial court erred in instructing the jury and in excluding the testimony of an expert witness. Finally, he contends that he received ineffective assistance of counsel in several regards. For the reasons that follow, we reverse the denial of Shaw's motion for new trial.

When the appellate courts review the sufficiency of the evidence, they do not "re-weigh the evidence" or resolve conflicts in the testimony; instead they defer "to the jury's assessment of the weight and credibility of the evidence." *Greeson v. State*, 287 Ga. 764, 765 (700 SE2d 344) (2010). See also *Glaze v. State*, 317 Ga. App. 679, 681 (1) (732 SE2d 771) (2012). Appellate courts determine whether "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (citations and emphasis omitted).[1]

Construed in favor of the verdict, the evidence presented at trial shows that early on March 22, 2014, the 20-year-old victim and his girlfriend went to the Waffle House and sat in a booth near the restroom, with the victim taking the inside seat. Shaw entered the restaurant at about the same time, along with his wife and sister, and the three eventually went to the restroom together. The victim and his girlfriend heard

---

[1] Appellant's citations to the record are not in proper form. We remind the bar that the Rules of the Court of Appeals require that record and transcript citations must be to the volume or part of the record or transcript and the page numbers that appear on the appellate records or transcript as sent from the court below. See Rule 25. Accordingly, parties should not cite to the page number of a document, such as a deposition or affidavit, included in the record but rather to the record page number.

2

yelling coming from the restroom, and when Shaw and the two women exited the restroom, Shaw asked the victim, "Did y'all hear us f_____ screaming in the bathroom?" At this point, the victim concluded that "it was a bad situation." Shaw then started yelling and pushing his sister and indicating that he was trying to ask the victim and his girlfriend a question. The victim testified,

> And then he kept getting closer and, like, standing over us, yelling at us, and cussing at us, like in a threatening manner. . . . He was like, could you hear me f_____ screaming in the bathroom? I'm not going to ask you again, and saying stuff like that. And then that's when I pulled the knife out of my pocket and laid it on my lap.[2] And then I believe the sister saw the knife when I had it in my lap, and she started yelling, you don't know what he's been through, you don't know what the f___ he's been through for this country and for you. . . . Then he ended up — he sat down in front of us. [My girlfriend] grabbed the knife and closed it. And that's when he was smiling and laughing, saying, do you realize how many people I've killed with these hands, and what I can do to you with these hands right now?

A waitress arrived in the middle of this conversation and repeatedly requested that Shaw leave the restaurant, but Shaw remained for over a minute. The victim continued,

---

[2] The victim's girlfriend testified that the blade was open.

And then that's when he started saying, like yelling around the room, saying, he's disrespecting a f_____ veteran. . . . And then that's when I said, you're not a veteran, because veterans don't come back and treat civilians like this.

At this point, Shaw "came over the table," grabbed the victim, picked him up, and began to hit him in the head. The waiter called the police. Shaw wrestled the victim to the ground and bit him on the face; the victim testified that Shaw was "grabbing my head and pulling with his teeth, trying to pull the skin off of my face." The biting caused a wound that took four months to "close up" and left a scar that was visible at trial. Shaw also "stuck his thumb down in the corner of [the victim's] eye and tried to pop [the victim's] eye out." Shaw repeatedly punched the victim, causing the victim's head to hit against the floor, which in turn, caused the victim to lose consciousness several times. When the victim attempted to move or get up, Shaw would hit him again to the same effect. The victim suffered a concussion as a result. During the incident, the victim thought that Shaw was going to beat him to death.[3] The State's witnesses testified that Shaw appeared to be drunk, angry, and aggressive from the beginning of the encounter.

---

[3] Video tape evidence of the incident was introduced, but it is from a distance and taken from behind the victim.

Shaw testified in his own defense that he was 25 years old; had served in the United States Army since he was 19, including at the time of the incident; and was, at the time of trial, employed by a subcontractor to Georgia Power. He testified that he received a medical discharge from the army because he has Tourette's syndrome, obsessive-compulsive disorder (OCD), a tic or twitch disorder, and post traumatic stress disorder (PTSD). Shaw testified that on the night before the incident, he, his wife, and his sister attended a social event from 6:30 p.m. to 2:30 a.m., and that he had several drinks over the course of the night. Sometime after leaving the event, Shaw and the two women then went to the Waffle House. Shaw testified that after coming out of the bathroom, he was introduced to the victim and his girlfriend and that he was calmly talking to the couple, apologizing for yelling in the bathroom, and explaining that he yelled because of his Tourette's syndrome. He testified that he put out his hand to introduce himself to the victim but that the victim would not shake hands. Shaw testified that as he was sitting down he saw the victim pull out a knife and that the victim brought the knife to within a foot of Shaw's neck. Shaw testified that he thought the victim intended to kill him or cut him, "or something" and that he feared for his life. He testified that as the tension escalated, the waitress come over and told him to go to his own booth and told the victim to put the knife away. Shaw

testified that he further attempted to calm the victim down but that when the victim's girlfriend stood up, he became worried that the victim would attack Shaw's wife and sister. Accordingly, Shaw testified, he then hit the victim with the inside of his hand and his bracelet apparently cut the victim's cheek. Shaw testified that he and the victim came out of the booth and ended up on the floor where Shaw was able to disarm the victim of the knife. Shaw testified that he had a panic attack after the police arrived, which was corroborated by State witnesses. Shaw's wife testified in support that she saw the victim holding the knife above the table one to two feet away from Shaw. She also corroborated other aspects of Shaw's testimony. Shaw's sister did the same.

At the conclusion of the evidence, the court charged the jury on, among other things, the crimes of aggravated assault and the lesser-included offense of simple assault, as well as aggravated battery and the lesser-included offense of battery. But in charging battery, the court omitted the word "substantial" from the part of the definition of battery that requires a showing of "substantial" physical harm. The jury later asked the court to explain the difference between aggravated battery and "simple battery," the latter of which had not been charged, and the parties and the court agreed that a "recharge" was appropriate. The court then repeated the aggravated

battery charge but did not repeat an instruction on battery; instead it charged the jury on simple battery, and it read that charge to the jury three times. Neither party objected to the court's action. The jury found Shaw guilty of the greater charges of aggravated assault and aggravated battery.

1. Shaw contends the evidence was insufficient to support the conviction of aggravated battery, based solely on the argument that the victim did not sustain a "seriously disfiguring injury."[4] We disagree.

Shaw was indicted for aggravated battery in that he "did maliciously cause bodily harm to [the victim] by seriously disfiguring a member of his body, by biting into [the victim's] cheek and tearing open the victim's flesh, causing scarring. . . ." "Although OCGA § 16-5-24 does not define the term 'serious[ly] disfiguring,' this Court has ruled that the crime of aggravated battery does not require that the victim's disfigurement be permanent; however, the injury must be more severe than a mere visible or superficial wound." *Levin v. State*, 334 Ga. App. 71, 74 (1) (778 SE2d 238) (2015) (citation, punctuation, and emphasis omitted). The question of whether the

---

[4] "A person commits the offense of aggravated battery when he or she maliciously causes bodily harm to another by depriving him or her of a member of his or her body, by rendering a member of his or her body useless, or by seriously disfiguring his or her body or a member thereof." OCGA § 16-5-24 (a).

defendant's actions caused "serious disfigurement" is for the jury. *Underwood v. State*, 283 Ga. App. 638, 641 (3) (642 SE2d 324) (2007). Here, the State showed that the victim suffered a concussion and sustained a wound on his face that took months to close up and that left a dime-sized scar. Accordingly, the jury was authorized to conclude that the victim suffered more than just a superficial wound. See, e.g., *Jackson v. State*, 316 Ga. App. 588, 591 (1) (730 SE2d 69) (2012) ("Whether the scars rose to the level of serious disfigurement was a factual issue for the jury to resolve.") (citations omitted); *Levin*, 334 Ga. App. at 74 (1) (jury authorized to find serious disfigurement where beating victim had a "bruised and swollen face, with one eye swollen shut, and a 'goose egg' on her face[,]" together with bruised and swollen hands and cut feet). Compare *Williams v. State*, 248 Ga. App. 316, 317-319 (1) (546 SE2d 74) (2001) (evidence insufficient to support aggravated battery conviction where victim sustained minor scratches and bruises and there was no evidence of bleeding wounds or swelling).

The evidence was also sufficient to convict Shaw of aggravated assault as alleged in the indictment — by using his fists to beat the victim in the head and face, "said act placing said victim in reasonable apprehension of immediately receiving a violent injury and causing bruising, swelling, and dizziness." See OCGA § 16-5-21

8

(b) (2) ("A person commits the offense of aggravated assault when he or she assaults . . . with any object, device, or instrument which, when used offensively against a person, is likely to or actually does result in serious bodily injury"); *Sims v. State*, 296 Ga. App. 461, 462 (1) (675 SE2d 241) (2009) (evidence that defendant struck victim with his fists was sufficient to sustain his conviction for aggravated assault because fists are objects which, "when used offensively against another person, are likely to result in serious bodily injury").

2. Shaw contends the trial court erred in four ways with regard to jury instructions on the various forms of battery. Trial counsel did not object to any of the instances, and we therefore will review the charges only for "plain error which affects substantial rights of the parties." OCGA § 17-8-58 (b).[5] Our Supreme Court has interpreted this requirement as establishing a four-prong test:

> [T]he proper inquiry is whether the instruction was erroneous, whether it was obviously so, and whether it likely affected the outcome of the proceedings. If all three of these questions are answered in the affirmative, the appellate court has the discretion to reverse if the error

[5] The trial court held, in part, that although Shaw failed to object to the various battery charges, "the charge was not "so erroneous to rise to the level of substantial or harmful error as contemplated by OCGA § 5-5-24." Although that Code section is applicable to civil cases, the two statutes are "consonant" with each other. *State v. Kelly*, 290 Ga. 29, 32 (1) (718 SE2d 232) (2011).

seriously affects the fairness, integrity or public reputation of the proceedings below.

*State v. Kelly*, 290 Ga. 29, 33 (2) (a) (718 SE2d 232) (2011) (citations and punctuation omitted).

The trial court initially charged the jury on the second and third forms of battery — that is, battery and aggravated battery; the court did not initially charge on simple battery, the least violent form of the crime.[6] In its battery charge, the trial court stated that "a person commits the offense of battery when he intentionally causes physical harm or visible bodily harm to another," thus leaving out that the physical harm required by the statute is "substantial" physical harm. The court also did not give the definition of "visible bodily harm," which is provided in the statute. OCGA § 16-5-23.1 (b) ("the term 'visible bodily harm' means bodily harm capable of being perceived by a person other than the victim and may include, but is not limited to, substantially blackened eyes, substantially swollen lips or other facial or body parts,

---

[6] Simple battery is a misdemeanor, one form of which requires a showing of "physical harm to another." OCGA § 16-5-23 (a) (2). Battery is a more aggravated offense because it requires proof of "substantial physical harm or visible bodily harm." OCGA § 16-5-23.1 (a). Aggravated battery is a felony that requires additional proof of (i) malice, and (ii) bodily harm which seriously disfigures or renders a member of the victim's body useless. OCGA § 16-5-24 (a); see also *Christensen v. State*, 245 Ga. App. 165, 166 (1) (a) (537 SE2d 446) (2000).

10

or substantial bruises to body parts"). When charging on aggravated battery, although Shaw was only indicted on one form of aggravated battery for "seriously disfiguring" the victim by biting him, the court charged on two forms of aggravated battery, by charging that the Shaw would have committed aggravated battery if he (1) deprived the victim of a member of his body by rendering it useless, or (2) seriously disfigured the victim's body or a member thereof. See OCGA § 16-5-24 (a). Then, in response to a jury question asking the court to clarify the difference between aggravated battery and "simple battery,"[7] the court repeated the aggravated battery charge, but instead of repeating the battery instruction, the court mistakenly charged the jury on simple battery, repeating it three times.[8]

---

[7] The jury had not been charged on simple battery at this point and apparently meant to ask the difference between battery and aggravated battery, the charges it had already been given.

[8] The court charged OCGA § 16-5-23 as follows:
A person commits the offense of simple battery when he or she either:
One, intentionally makes physical contact of an insulting or provoking nature with the person of another . Or, two, intentionally causes physical harm to another.

Shaw asserts plain error based on four charging errors: (1) the trial court's failure to instruct the jury that the physical harm required to prove battery must be "substantial"; (2) the trial court's instruction on simple battery when the jury asked for clarification, as well as the court's failure to recharge on battery with the correct wording; (3) the court's failure to read the definition of "visible bodily harm" as a part of the charge on battery; and (4) the court's failure to charge only on the form of aggravated battery used in the indictment. For the reasons shown below, we conclude that the court committed plain error as described in charging errors Nos. 1 and 2 above, at a minimum.

The State concedes, and we agree, that the court clearly and obviously erred as shown in charging errors Nos. 1 and 2; we also find that the error likely affected the outcome of the trial and that it seriously affected the fairness of the proceedings.

The failure to charge that the physical harm required to prove battery must be "substantial" omitted an essential element of the crime of battery. OCGA § 16-5-23.1; *Christensen*, 245 Ga. App. at 166 (1) (a). And "the failure to inform the jury of an essential element of the crime charged is reversible error because the jury is left without appropriate guidelines for reaching its verdict." *Chase v. State*, 277 Ga. 636, 640 (2) (592 SE2d 656) (2004) (citations omitted). The court again erred in the

12

recharge by failing to recognize that the jury was confused about the various forms of battery, by failing to correct the original error in the definition of battery, and by charging on simple battery, which was not an issue in the case. When a jury requests clarification of the court's charge, the court has a duty to provide correct charges:

> When the jury requests the court to recharge . . . on any point, it is the court's duty to do so. Such further instruction must be in plain, clear language calculated to enlighten rather than confuse the jury.

*Quiroz v. State*, 291 Ga. App. 423, 426 (3) (662 SE2d 235) (2008) (punctuation and footnote omitted). Here, in response to a request for clarification, the court confused the jury by charging on a crime — simple battery — that was not part of the case, repeating the definition of that crime three times, and failing to correct the original erroneous charge on battery.

These errors likely affected the outcome of the trial because it gave the jury the false choice of deciding whether Shaw committed simple battery, which requires the least severe showing of harm of the three forms of battery, or aggravated battery, which requires a showing that the person caused bodily harm to the victim by "seriously disfiguring his or her body or a member thereof." See OCGA § 16-5-24 (a); see also *Williams v. State*, 248 Ga. App. 316, 318 (1) (546 SE2d 74) (2001) (the

13

statutes create three forms of battery which "categorize the types of battery by the severity of the harm inflicted and to provide harsher penalties for batteries that result in more severe bodily harm"). The jury was obviously confused about the various forms of battery and was deprived of the option of convicting Shaw of battery, both because the original battery charge was flawed and because the recharge put the jury's focus on simple battery. Accordingly, the jury never was instructed properly that it had the option of finding Shaw guilty of battery by "intentionally causing substantial physical harm or visible bodily harm" to the victim, which can be a misdemeanor and which at most carries a penalty of five years imprisonment. OCGA § 16-5-23.1. "When a given instruction fails to provide the jury with the proper guidelines for determining guilt or innocence, it is clearly harmful and erroneous as a matter of law." *Chase*, 277 Ga. at 639 (2) (citation and punctuation omitted). These errors seriously affected the fairness of the proceedings for these same reasons.

*Christensen*, 245 Ga. App. 165, upon which the State relies, is distinguishable. In that case, the court charged the jury on the visible-injury form of battery (without charging on "substantial physical harm" form), see OCGA § 16-5-23.1 (a) & (b), as well as on aggravated battery for either seriously disfiguring the victim or rendering a member of his body useless, see OCGA § 16-5-24 (A), for which Christensen was

14

convicted. On appeal, Christensen claimed that the trial court erred by failing to charge the jury on simple battery under OCGA § 16-5-23. Id. at 165 (1) (a). This Court held that because the victim sustained a substantially blackened eye, "there was no evidence to support a simple battery charge under OCGA § 16-5-23 because it went undisputed that the injury to the victim consisted of 'visible bodily harm.'" Id. at 165-166 (1) (a). The court held that Christensen could show no harm from the lack of a charge on simple battery because, "[b]y its verdict, the jury found the additional aggravating circumstances necessary to convict on the greater felony offense," i.e., aggravated battery. Id. at 166 (1) (a). In other words, given that the jury rejected the second form of battery in favor of the third, Christensen could show no harm by a failure to charge the jury on the lowest form of battery. The issue facing the jury in the present case was not the same; it faced the choice of convicting Shaw of the first and third forms of battery, and it was deprived of the opportunity to consider the second form of battery. Thus, just because the jury rejected simple battery in the present case does not mean that the jury would not have found that Shaw committed battery.

In conclusion, the trial court plainly erred with regard to charging errors No. 1 and 2 and therefore also erred by refusing to grant a new trial on Shaw's conviction

15

of aggravated battery. We therefore need not consider whether the court also plainly erred with regard to charging errors No. 3 and 4. We also need not consider any assertions of ineffective assistance of counsel with regard to any charging errors related to the conviction of aggravated battery.

3. Shaw next contends that his trial counsel was ineffective "by attempting to present an insanity or delusional compulsion defense without taking the steps necessary to give the jury the option to find Mr. Shaw not guilty by reason of insanity." See OCGA § 16-3-3 ("A person shall not be found guilty of a crime when, at the time of the act, omission, or negligence constituting the crime, the person, because of mental disease, injury, or congenital deficiency, acted as he did because of a delusional compulsion as to such act which overmastered his will to resist committing the crime.")

To prevail on this claim, Shaw must prove both that his lawyer's performance was deficient and that he suffered prejudice as a result of this deficient performance. *Strickland v. Washington*, 466 U. S. 668, 687 (III) (104 SCt 2052, 80 LEd2d 674) (1984). If he cannot meet the burden of proving either prong of the *Strickland* test, then we need not examine the other prong. *Battles v. State*, 290 Ga. 226, 229 (2) (719 SE2d 423) (2011). With respect to the first prong, deficient performance, the

16

defendant must show that his attorney performed his duties at trial in an objectively unreasonable way, considering all the circumstances, and in light of prevailing professional norms. *Strickland*, 466 U. S. at 687-688 (III) (A). To demonstrate that he suffered prejudice, a defendant must prove "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694 (III) (B). "This burden, though not impossible to carry, is a heavy one." *Arnold v. State*, 292 Ga. 268, 270 (2) (737 SE2d 98) (2013), citing *Kimmelman v. Morrison*, 477 U. S. 365, 382 (II) (C) (106 SCt 2574, 91 LE2d 305) (1986). On appeal "we accept the trial court's factual findings and credibility determinations unless clearly erroneous, but we independently apply the legal principles to the facts." *Suggs v. State*, 272 Ga. 85, 88 (4) (526 SE2d 347) (2000) (footnote omitted).

The record from the trial shows irreconcilable inconsistency in Shaw's counsel's approach to defending Shaw. Several weeks before trial, Shaw's counsel listed Dr. Thomas Sachy, Shaw's psychiatrist, on a witness list. Just prior to trial, and apparently in anticipation of Shaw's strategy, the State proposed jury instructions that included instructions on the defense of insanity and mental illness. And one day

17

before trial, Dr. Sachy spoke to a prosecutor and explained that he had been treating Shaw for a year leading up to trial for symptoms, including that he repeatedly and uncontrollably prayed out loud during battle, which, the prosecutor advised the court during pretrial discussions, would cause the jury to believe that Shaw was not sane. As trial proceedings commenced, the State pointed out that Shaw had not followed required procedures for asserting a defense based on insanity or other mental illness, including giving proper notice of the proposed use of an expert witness and producing the witness's opinion; the court sustained the objection.

> Shaw's counsel replied that Shaw was not making a defense of that type:

> As to the insanity, we've tried to stay away from that as much as we could, because he's 25 years old and has the rest of his life in front of him. And if he's found not guilty because of insanity, it's going to be hard for him to make a living for the rest of his life. So we're not looking for a not guilty by reason of insanity in this case.

Even so, Shaw's counsel indicated that Dr. Sachy was a possible witness, yet counsel admitted that he had not hired or talked to Sachy for more than five minutes before trial. Counsel stated to the court, "We don't know whether the doctor will qualify as an expert or not," and counsel would decide whether Sachy would testify when counsel was able to speak to Sachy at noon on the first day of trial. During the

18

presentation of the evidence, Shaw's counsel attempted to call Sachy to the stand, whereupon the State objected on the ground that it had not received proper notice that Sachy would be testifying as an expert. The court agreed and barred Sachy from testifying, but allowed Shaw's counsel to make a proffer of Sachy's testimony. Shaw's counsel then asked whether Sachy could testify as Shaw's doctor, which the court also denied on the ground that Sachy was not a fact witness to the crime and that any testimony about Shaw would necessarily fall into the category of expert testimony. In the proffer, Sachy testified that he had been treating Shaw for Tourette's syndrome, anxiety disorder, OCD, and PTSD.

With the jury back in court, Shaw's counsel elicited testimony from two witnesses and Shaw to show that Shaw suffered from a variety of mental illnesses. Shaw's wife testified that Shaw had Tourette's symptoms including peculiar movements, verbal tics, an elevated voice, yelling, and constant praying, sometimes aloud. She testified that Shaw was experiencing elevated levels of his symptoms at the Waffle House. Shaw's sister testified on cross-examination that Shaw had Tourette's and PTSD. Shaw testified on direct that he developed neurological problems in the army, including Tourette's, OCD, PTSD, and a "tic-disorder," and he

19

expounded on how some of those issues manifest themselves in his life and how they affected him on the night of the incident.

Following the presentation of evidence, Shaw's counsel then requested a jury charge on delusional compulsion, which was denied on the grounds that Shaw had not properly raised any defense regarding Shaw's mental state because Shaw did not give the State notice of an insanity defense. Yet during closing, Shaw's counsel argued to the jury "You were told that he had Tourette's and . . . how it affects him. And the OCD, how that affects him"; that Shaw has "two diseases: Attention Deficit Disorder [sic] [and] Post Traumatic Stress"; that Shaw had "wounds that are not visible" and that he was a "wounded warrior"; and that "[t]here's a difference between being sick and being a criminal. You've got to decide which one Mr. Shaw is. Is he sick or is he a criminal?"

At the hearing on the motion for new trial, Shaw's trial counsel testified that he had been practicing law about 60 years, and he stated at trial that he had not tried a case in 15 years. Shaw's trial counsel then proceeded to give self-contradictory testimony regarding his strategy for defending Shaw. He testified that he spent a lot of time with Shaw getting ready for the trial and that he had no problem communicating with Shaw. Counsel testified that he reviewed possible defenses with

Shaw and developed the opinion that self-defense was the best approach. When asked if he thought that Shaw's mental illness would play a role in the defense, Shaw's counsel responded, "I don't think so."

Yet Shaw's counsel testified that prior to trial, he tried repeatedly to contact Dr. Sachy but that Sachy would never respond. He was able to obtain some of Shaw's military medical records. Other than these efforts, Shaw's counsel made no effort to investigate Shaw's mental health; he never had Shaw evaluated by a mental health professional. Shaw's counsel testified that "we" "did not try to show that [Shaw] was insane or anything like that *because he wasn't* and it's dangerous giving a public perception of somebody being mentally ill. It makes it hard for them to live the rest of their life, and we tried to protect [Shaw] that way as much as we could." (Emphasis supplied). He reiterated that he did not believe that Shaw was "insane." Counsel testified that he understood the insanity defense to be applicable when a person cannot distinguish between right and wrong. And he did not do any research into the consequences of a verdict of not guilty by reason of insanity other than his recollections of one of his own cases from the past. Counsel testified that his comment to the jury about them having to decide whether Shaw was "sick" was simply intended to get them to acquit him. Yet he admitted that he asked for a charge

21

on delusional compulsion and thought that Shaw was entitled to such a charge based on the panic attack that Shaw suffered after the police arrived.

Also at the hearing on the motion for new trial, Shaw's wife and Shaw testified that they thought that Shaw's mental health issues would factor into his defense at trial. Shaw also testified that his trial counsel began representing him approximately one year prior to the trial and that counsel was provided with Shaw's medical records from his military service and contact information for Shaw's treating psychiatrist.

(a) With regard to deficient performance of counsel, the Supreme Court of Georgia has described the principles of *Strickland* as they relate to defense counsel's decisions regarding investigation, including strategic choices made after less than complete investigation:

> "Strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."

22

*Martin v. Barrett*, 279 Ga. 593, 593-594 (619 SE2d 656) (2005), quoting *Wiggins v. Smith*, 539 U. S. 510, 521-522 (II) (A) (123 SCt 2527, 156 LE2d 471) (2003). Furthermore, in the absence of some other determination regarding the defendant's mental state, "where a defense attorney has received information from a reliable source that his client has had a history of psychiatric problems, but failed to adequately investigate this history, counsel failed to provide effective assistance." *Martin*, 279 Ga. at 594 (citations and punctuation omitted). And attorneys usually may not rely on their own assessment of the defendant's mental health. Id. at 595 ("It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of the client's history of mental problems.") (citation and punctuation omitted).

Here, we conclude that Shaw's trial counsel's performance was deficient in that he either seriously mishandled an attempt to assert a defense of delusional compulsion or made an unreasonable decision not to investigate the possibility of asserting that defense.

As shown above, Shaw's trial counsel was aware at the time of trial that Shaw likely had PTSD and other maladies that could have affected his behavior on the night of the incident. Even the State, after a brief telephone call with Dr. Sachy, objected

23

to his testimony on the ground that it would lead the jury to conclude that Shaw was insane. And although counsel had listed Dr. Sachy, Shaw's psychiatrist, as a witness weeks before trial, counsel did not speak with Sachy during that time and did not properly notify the state of an intent to assert an insanity defense or to call an expert witness. Further, and although counsel claimed at the start of trial that he had made a decision not to assert such a defense because of a the potential stigma that Shaw might suffer in the future, Shaw's counsel unsuccessfully continued to present testimony from Sachy about Shaw's mental state; hoped he could still qualify Sachy as an expert; elicited testimony from Shaw, his wife, and sister about Shaw's mental condition and the effect it had on him on the night of the incident; unsuccessfully attempted to have the court charge the jury on the defense of delusional compulsion; and argued to the jury that they should acquit Shaw because he was "sick."

Moreover, the evidence strongly suggests that counsel did not fully understand the defense of delusional compulsion and did not perform any research about the effect of asserting such a defense. Counsel testified that he understood the insanity defense to mean inability to distinguish right from wrong. That understanding is correct, see OCGA § 16-3-2, but counsel failed to describe a delusional compulsion, which allows a defense even if the defendant understands the difference between right

24

and wrong.[9] And a decision "based upon [a] lack of understanding of or familiarity with the relevant law" is not strategic. *Sullivan v. Kemp*, 293 Ga. 770, 774 (2) (749 SE2d 721) (2013).

Even if Shaw's counsel did make the strategic decision not to assert an insanity defense, that decision, too, was legally flawed. Counsel testified that he based his decision, in part, on the fact that he had concluded, without expert advice, that Shaw was not insane: "I didn't think he was insane." Thus, to the best of his recollection, he did not anticipate that Shaw's mental condition would play a role in the defense. Yet the Supreme Court has made clear that a lawyer is not authorized to make such a determination on his own:

> where a condition may not be visible to a layman, counsel cannot depend on his or her own evaluation of someone's sanity once he has reason to believe an investigation is warranted because, where such a

[9] "General insanity is not a defense to a crime; the only defenses recognized in Georgia are found in OCGA § 16-3-2 [] (no capacity to distinguish right from wrong at the time of the act, omission, or negligence) and OCGA § 16-3-3 [ ] (delusional compulsion at the time of the act, omission, or negligence constituting the crime). *Gould v. State*, 168 Ga. App. 605, 609 (4) (309 SE2d 888) (1983); *Reeves v. State*, 196 Ga. 604, 614-615 (a) (27 SE2d 375, 381 (1943) ("even if one has reason sufficient to distinguish between right and wrong, yet if in consequence of some delusion the will is overmastered, and there is no criminal intent, he is not responsible, provided that the act itself is connected with the peculiar delusion under which the defendant is laboring") (citation omitted).

condition exists, the defendant's attorney is the sole hope that it will be brought to the attention of the court.

*Martin*, 279 Ga. at 595 (citation, punctuation, and emphasis omitted). Here, Shaw's counsel knew at the time of trial that Shaw had been in combat, had psychological disorders, and was seeking treatment from a psychiatrist, yet he relied on his own opinion that Shaw was not insane, a defense that counsel appears to have only partially understood, without performing additional investigation, in deciding not to pursue a delusional compulsion defense.

For the above reasons, we conclude that trial counsel's performance was deficient under *Strickland*.

(b) With regard to harm, we conclude that the deficient performance was sufficient to undermine confidence in the outcome of the trial.

At the hearing on the motion for new trial, Shaw presented the testimony of Dr. Kevin Richards, a licensed psychologist certified in forensic psychology by the American Board of Forensic Psychology with significant experience evaluating members of the military and those who have been released from the military. Richards had examined Shaw and prepared a report of his opinions based on that examination. Richards diagnosed Shaw as having Tourette's syndrome, OCD, and PTSD. Shaw

had been diagnosed previously with Tourette's and OCD when he was in the military, and Richards found Shaw's condition to be consistent with the findings of the military doctors. Richards testified that Tourette's can cause Shaw to yell obscenities, that it can be exacerbated by stress, and that it can cause Shaw to appear to be under the influence of alcohol or drugs. He testified that Shaw's OCD causes him to be unable to "disengage from an interaction unless he believes things are positive," and that a situation can cause him to become increasingly anxious as he continues "to make efforts to make [an] interaction end on a positive note." Finally, Richards testified that PTSD can cause a person to perceive that they are experiencing a stressful situation that, in fact, they are not in. Specifically, Shaw had a PTSD symptom that can cause him to believe that he is in danger when he is not. It causes him to direct his behavior "based on a faulty perception . . . then behaving as if that belief were true or that perception true." Richards also performed psychological tests to determine whether Shaw was feigning his symptoms, and Richards concluded that he was not.

Based on the above diagnoses, Richards testified that Shaw's Tourette's symptoms could have caused Shaw to make involuntary verbal noises in the restroom that sounded like arguing and could have made Shaw appear to be "bizarre" when

27

Shaw approached the victim and his girlfriend; that when he approached the victim, Shaw's OCD caused him to sense that the victim was not responding and that the interaction was not a positive one so he sat in the booth and persisted in speaking with the victim; that because of his PTSD, when Shaw saw a knife, he thought he was in a life-threatening situation and that "he started to sort of go into military mode and he was looking for an escape route and figuring out how to protect the people he was with and himself"; that even if the knife had been put away, Shaw thought it was still there; and that as a result, Shaw did not believe that he had any option other than to disable and disarm the victim. Richards testified that in his opinion, the incident represented "an acute episode of [Shaw's] illnesses where the symptoms were acutely exacerbated." Richards concluded that Shaw's behavior amounted to a delusional compulsion under the circumstances and that he would have given the same testimony if called at trial. He admitted, however, that Shaw's consumption of alcohol could have exacerbated Shaw's symptoms, but his overall opinion was that Shaw's symptoms that night were explained by his mental condition not by alcohol or any medications that he might have been taking.

This testimony was sufficient to raise a reasonable probability that the jury would have accepted the defense of delusional compulsion. Such a defense is

available only when the defendant is "suffering under delusions of an absurd and unfounded nature and was compelled by that delusion to act in a manner that would have been lawful and right if the facts had been as the defendant imagined them to be." *Woods v. State*, 291 Ga. 804, 810 (3) (733 SE2d 730) (2012) (citation and punctuation omitted). "A finding of insanity based upon OCGA § 16-3-3 requires proof that (1) the accused acted under a delusional compulsion; (2) the criminal act was connected with the delusion; and (3) the delusion related to a fact which, if true, would have justified the act. " *Appling v. State*, 222 Ga. App. 327, 329 (3) (474 SE2d 237) (1996) (citation omitted). Here, all three requirements were shown.

In sum, Shaw has established that he received ineffective assistance of counsel in that his counsel either seriously mishandled an attempt to assert a defense of delusional compulsion or made an unreasonable decision not to investigate the possibility of asserting that defense. For this reason, we reverse the denial of his motion for new trial. See *Fedak v. State*, 304 Ga. App. 580, 586 (1) (696 SE2d 421) (2010) (ineffective assistance established where there was a reasonable probability "that had trial counsel investigated [the defendant's] MS and its impact on his cognitive abilities and presented evidence regarding the same, that evidence could have influenced the outcome of the trial") (citation omitted). We need not reach the

remaining of enumerations of error on the ground that they are not likely to recur at trial.

*Judgment reversed. Mercier, J., concurs. Ellington, P. J., concurs in judgment only.*