**SECOND DIVISION**
**MILLER, P. J.,**
**DOYLE and REESE, JJ.**

**NOTICE:** Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**August 9, 2017**

# In the Court of Appeals of Georgia

A17A0968. PUCKETT v. THE STATE.

REESE, Judge.

A Gwinnett County jury found Mary Puckett guilty of kidnapping, felony theft by taking a motor vehicle, and two counts each of armed robbery and false imprisonment.[1] She appeals from the denial of her motion for new trial, contending that the evidence was insufficient to support her convictions, that the evidence was insufficient to support a felony sentence on the theft by taking charge, and that she received ineffective assistance of counsel. For the reasons set forth, infra, we affirm.

Viewed in the light most favorable to the jury's verdict,[2] the record reveals the following facts. On April 2 and 3, 2015, two incidents involving armed robbery, false

---

[1] OCGA §§ 16-5-40 (a); 16-8-2; 16-8-12 (a) (1) (C); 16-8-41 (a); 16-5-41 (a).

[2] See *Rankin v. State*, 278 Ga. 704, 705 (606 SE2d 269) (2004).

imprisonment, kidnapping, and theft by taking occurred at the Red Roof Inn on Lawrenceville Suwanee Road in Gwinnett County. The parties to the crimes included Kayla Folds, Andy Ulysse, Teddy Williams, Cornelius Cupsa, and the Appellant, Mary Puckett. The Appellant was Ulysse's girlfriend, and the couple lived with Folds and Williams.

Before the first incident occurred on April 2, Ulysse told the Appellant to get some bullets and bring them to him in Room 232 of the Red Roof Inn, and the Appellant complied. The Appellant then left the room and waited in Williams' car in the motel's parking lot.

The first incident involved a man named Joshua Smith, who called Folds, a prostitute, and made an appointment for her services. Folds instructed Smith to come to Room 232 of the Red Roof Inn. When he arrived at the motel, Smith noticed a car with its headlights on in the parking lot, parked so it was facing the street and could exit quickly. Smith knocked on the door to Room 232 and, when Folds answered the door, she mouthed the words "I'm sorry." As Smith took a step into the room, he was struck in the head by Ulysse, who had been standing behind the door. Williams and Cupsa then came out of the bathroom carrying guns and forced Smith to the floor, threatened to kill him, and demanded his wallet, credit cards, phone, and car keys.

2

Smith informed Ulysse that he had already withdrawn the maximum amount of cash allowed from the ATM because he was going on vacation, but told him there was more money at his apartment. Ulysse forced Smith down the motel's stairs at gunpoint and made him get into the driver's seat of Smith's car. The Appellant, who was sitting in Williams' car and saw the men walk to Smith's car, called Ulysse to ask for the address of where they were going. Smith drove Ulysse to Smith's apartment. The Appellant followed them in Williams' car, accompanied by Folds, who was in the front passenger seat, and Williams, who was in the seat directly behind the Appellant. During the trip, however, the Appellant got lost and called Ulysse for directions.

While the Appellant, Folds, and Williams were lost, Ulysse and Smith arrived at Smith's apartment. Ulysse took $1,200 in cash and other items from the apartment. Ulysse then called the Appellant and told her to come pick him up from Smith's apartment. The Appellant eventually found her way to Smith's apartment complex, picked up Ulysse, and drove back to the Red Roof Inn.

Smith did not call the police after the armed robbery, explaining to the jury at the Appellant's trial that he was happy to be alive and had only lost material things that could be replaced. Police officers subsequently interviewed him, however, as a

3

result of their investigation of the second incident at issue in this case. During the interview, Smith told the officers that the people who attacked and robbed him knew where he lived and he was terrified of them.

The second incident occurred later the same night when another man, Duane Gardner, called Folds and arranged to meet her at the same Red Roof Inn. Upon entering Room 232, Gardner saw Folds and the Appellant. The two claimed they were sisters, and the Appellant left the room shortly after Gardner arrived. However, before the Appellant left, Folds gave her the room key to give to Ulysse and Williams.

The Appellant went downstairs to Williams' car, where Ulysse and Williams were waiting, and sat in the back seat of the car. Williams drove to the other side of the motel and parked so the car was facing Room 232. Ulysse and Williams then left the car while the Appellant remained in the back seat.

Shortly after the Appellant had left Room 232, Gardner and Folds were on the bed when there was a knock on the door. Folds told Gardner that it was her sister, and she opened the door. Instead of the Appellant, however, it was Ulysse and Williams; both men were carrying guns. Ulysse and Williams entered and immediately demanded Gardner's money, car keys, cell phone, and debit card pin number. Ulysse forced Gardner to lie down in a corner of the room and threw a sheet over his head.

4

Ulysse warned Gardner that, if the pin number did not work, "my friend is going to shoot you," and then left.

Ulysse went downstairs and told the Appellant, who was still waiting in Williams' car, to get out and follow him. The Appellant and Ulysse got into Gardner's 2002 Honda Accord, and the Appellant started to drive. They heard a gunshot coming from the direction of Room 232, however, so the Appellant parked the car in front of the Red Roof Inn. The Appellant and Ulysse got out of Gardner's car and walked to the parking lot of the Super 8 motel next door. Ulysse told the Appellant to go back to the Red Roof Inn to see if the police were there, and the Appellant complied. When the Appellant returned to Ulysse, they hid in some nearby bushes for about five minutes. Ulysse and the Appellant then separated briefly before meeting up again at a nearby Chevron gas station.

Meanwhile, shortly after Ulysse had left the hotel room, Williams' shotgun went off. Gardner jumped up, scuffled with Williams, and escaped the motel room. Gardner ran outside and into the street, where he encountered an officer who was conducting a traffic stop. Gardner told the officer that he had just been robbed by two men with guns. The officer had Gardner sit in the patrol car and called for backup

assistance. While waiting, Gardner suddenly saw the Appellant and Ulysse outside the Chevron station, and he alerted the officer.

Two other officers went to the Chevron station, where they saw the Appellant and Ulysse standing outside a car, talking to the car's driver. One of the officers asked the Appellant and Ulysse to step over to the patrol car so he could talk with them, while the other officer spoke with the driver. The driver said that the Appellant and Ulysse had approached her car and asked if they could use her phone. During a subsequent search of a nearby area of trees and overgrown brush, an investigator found a sweatshirt that matched Gardner's description of one worn by one of his assailants, along with a hat, a loaded handgun, and car keys. The car keys belonged to Gardner. Further, at the time the Appellant and Ulysse were detained by officers outside the Chevron station, Ulysse was not wearing a shirt.

Police officers transported the Appellant and Ulysse to a police station, where an investigator interviewed them separately. The Appellant admitted to him that she had been in Room 232 of the Red Roof Inn earlier that night to smoke marijuana, but she repeatedly denied any knowledge about the armed robbery. Officers released both the Appellant and Ulysse after their interviews, but, following further investigation of both incidents, including a second interview of the Appellant, police officers

6

arrested the Appellant on the instant crimes.[3] The State ultimately charged the Appellant with the armed robberies of Smith and Gardner, the false imprisonment of Smith and Gardner, the kidnapping of Smith, and the felony theft by taking of Gardner's car.

At the Appellant's jury trial, in addition to presenting the above evidence, the State played a patrol car "dashcam" recording of Gardner's encounter with the police officer in the street immediately after the armed robbery and the resulting detention of the Appellant and Ulysse at the Chevron station. The recording at the Chevron station showed the Appellant laughing and joking with Ulysse and two police officers while they waited outside the patrol car for information about the investigation that other officers were conducting at the Red Roof Inn. After the officers put Ulysse in the backseat of the patrol car, the recording shows that the Appellant continued to laugh and chat with the officers outside the car. Despite being physically separated from Ulysse and in the presence of two police officers, however, the Appellant never told the officers that she was afraid of Ulysse, that she was being coerced by him, or that she needed their protection from him. Instead, she consistently expressed

---

[3] It appears that officers were unable to locate Ulysse and arrest him and that he was still at large at the time of the Appellant's trial.

7

complete ignorance about any crimes that had been committed at the Red Roof Inn. The State also played an audio-recording of a phone call from the Appellant to Ulysse that she made while incarcerated on the instant charges, as well as surveillance tapes from the Red Roof Inn and the Super 8 motel next door that showed, among other things, the Appellant driving away in Gardner's car and the Appellant's attempt to flee the area with Ulysse after they heard the gunshot that preceded Gardner's escape.

The Appellant's defense at trial was that she did not know that Ulysse and the others were planning to commit the crimes before they occurred, she did not know that crimes were being committed at the time they happened, and she did not participate in the armed robberies and false imprisonments of Smith and Gardner. Regarding the other crimes (the kidnapping of Smith and the theft of Gardner's car), she claimed that her participation was the result of being coerced by Ulysse and, to a lesser extent, Williams.[4] She testified that Ulysse often threatened and was violent toward her and that she believed he would hurt her if she refused to do what he told her to do during the commission of the crimes. Based upon this evidence, the trial court instructed the jury on the affirmative defense of coercion during its jury charge at the end of the trial.

---

[4] See OCGA § 16-3-26 (coercion).

The jury found the Appellant guilty beyond a reasonable doubt on all of the charges, and the court sentenced her to 30 years of imprisonment, to serve 12, with the balance on probation. The Appellant filed a motion for new trial, which the court denied after conducting a hearing. This appeal followed.

> On appeal from a criminal conviction, we view the evidence in the light most favorable to the verdict and an appellant no longer enjoys the presumption of innocence. This Court determines whether the evidence is sufficient under the standard of *Jackson v. Virginia*, [5] and does not weigh the evidence or determine witness credibility. Any conflicts or inconsistencies in the evidence are for the jury to resolve. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, we must uphold the jury's verdict.[6]

With these guiding principles in mind, we turn now to the Appellant's specific claims of error.

1. The Appellant contends that there was insufficient evidence to prove that she was guilty beyond a reasonable doubt of committing the armed robberies of Smith and Gardner. Specifically, the Appellant argues that there was no evidence that she

---

[5] *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

[6] *Rankin*, 278 Ga. at 705 (additional citations omitted).

was actually present in the motel room at the time the armed robberies took place or that she was aware of or participated in the planning of the armed robberies. She claims, instead, that she was merely present at the Red Roof Inn during the commission of those crimes and that such presence is insufficient as a matter of law to convict her as a party to the crimes.

> A participant to a crime may be convicted although he is not the person who directly commits the crime. A person who intentionally aids or abets in the commission of a crime or intentionally advises, encourages, hires, counsels or procures another to commit the crime may be convicted of the crime as a party to the crime. Mere presence at the scene is not sufficient to convict one of being a party to a crime, but criminal intent may be inferred from conduct before, during, and after the commission of a crime.[7]

(a) As an initial matter, the Appellant has not offered any argument or authority in support of an insufficient evidence claim as to her convictions for the kidnapping

_____

[7] *Huntley v. State*, 331 Ga. App. 42, 43 (1) (769 SE2d 757) (2015) (citation and punctuation omitted). See also OCGA §§ 16-2-6 (The trier of fact may find that a person acted with criminal intent through "consideration of the words, conduct, demeanor, motive, and all other circumstances connected with the act" for which the person is being tried.); 16-2-20 (a), (b) (3) (when a person may be convicted as a party to a crime).

of Smith or the theft of Gardner's car. Regardless,[8] we find that the evidence presented at trial was legally sufficient for the jury to find her guilty beyond a reasonable doubt of those crimes.[9]

(b) As to the armed robberies[10] and related false imprisonments[11] of Smith and Gardner that were committed in Room 232 of the motel, the State presented evidence showing that the Appellant obtained bullets for Ulysse shortly before the crimes occurred; waited in a car outside the room and acted as a lookout during the armed robbery of Smith; drove Williams' car to Smith's apartment after Ulysse forced Smith

---

[8] See *Darst v. State*, 323 Ga. App. 614, 617 (1), n. 8 (746 SE2d 865) (2013) (physical precedent only) ("Because due process requires the existence of sufficient evidence as to every element of the crime of which a defendant is convicted, the fact that this issue was not explicitly raised does not prevent us from addressing . . . the issue at this juncture.") (citations and punctuation omitted).

[9] See OCGA §§ 16-5-40 (a) ("A person commits the offense of kidnapping when such person abducts or steals away another person without lawful authority or warrant and holds such other person against his or her will."); 16-8-2 ("A person commits the offense of theft by taking when he unlawfully takes . . . any property of another with the intention of depriving him of the property[.]").

[10] See OCGA § 16-8-41 (a) ("A person commits the offense of armed robbery when, with intent to commit theft, he or she takes property of another from the person or the immediate presence of another by use of an offensive weapon[.]").

[11] See OCGA § 16-5-41 (a) ("A person commits the offense of false imprisonment when, in violation of the personal liberty of another, he arrests, confines, or detains such person without legal authority.").

to drive there so he (Ulysse) could steal more money and other items; picked up Ulysse after that robbery; and drove Ulysse, Folds, and Williams back to the Red Roof Inn. Further, Folds specifically testified that, while she, the Appellant, Ulysse, and Williams were still in the car after arriving back at the motel, they discussed robbing Gardner, who was on his way to the motel to have sex with Folds. After this discussion, the Appellant and Folds walked up to Room 232 and, when Gardner arrived, Folds gave the Appellant a room key to give to Ulysse and Williams, who were waiting outside in Williams' car. The Appellant went down to Williams' car, talked with Ulysse and Williams, and again waited in the car as a lookout while the men committed the armed robbery. Then, while Williams held Gardner at gunpoint in the motel room, the Appellant followed Ulysse to Gardner's car and, using the keys Ulysse stole from Gardner, drove the car away, stopping only after she heard Williams' shotgun go off. Finally, after abandoning Gardner's car in a nearby parking lot, the Appellant started to escape into a wooded area with Ulysse; ran back to the motel to see if the police had arrived to investigate the gunshot; waited while Ulysse disposed of his sweatshirt, hat, and handgun and Gardner's car keys in the brush; and then went with Ulysse to the nearby Chevron station, where they were detained by police officers.

The issue of whether the Appellant aided or abetted in the commission of the armed robberies or even knew about the robberies was a question for the jury to decide.[12] Furthermore, "[a] jury is authorized to believe or disbelieve all or any part of the testimony of witnesses, and it serves as the arbiter of conflicts in the evidence before it."[13] Given the overwhelming evidence of the Appellant's conduct before, during, and after the crimes at issue were committed, the jury was authorized to reject her testimony regarding her complete ignorance about the crimes and her claim that she was merely present at the motel while they were being committed.[14]

Consequently, after viewing the evidence in the light most favorable to the jury's verdict,[15] we conclude that it was sufficient for the jury to find that the

---

[12] See *Huntley*, 331 Ga. App. at 43 (1).

[13] *Lewis v. State*, 287 Ga. App. 379, 381 (651 SE2d 494) (2007) (citations and punctuation omitted). See also *Gordon v. State*, 329 Ga. App. 2, 4 (1) (763 SE2d 357) (2014) (The jury determines the credibility of the witnesses and, thus, was authorized to disbelieve the defense offered by the defendant.).

[14] The trial transcript shows that the court gave comprehensive jury instructions at the end of the trial that included, inter alia, charges on mere presence and party to a crime.

[15] See *Rankin*, 278 Ga. at 705.

13

Appellant was guilty beyond a reasonable doubt as a party to the crimes of armed robbery and false imprisonment as charged in the indictment.[16]

2. The Appellant contends that her trial counsel provided ineffective assistance when he failed to call an expert on "Battered Person Syndrome" ("BPS") to testify on her behalf at trial or, alternatively, for failing to file a motion asking the court to provide funds to hire an expert witness.

> In order to prevail on a claim of ineffective assistance of counsel, a criminal defendant must show that counsel's performance was deficient and that the deficient performance so prejudiced the client that there is a reasonable likelihood that, but for counsel's errors, the

---

[16] See *Buruca v. State*, 278 Ga. App. 650, 653 (1) (629 SE2d 438) (2006) (The evidence, although circumstantial, was sufficient for the jury to find that the defendant was the "getaway" driver who assisted others in committing an armed robbery and, as a result, to convict him as a party to the crime, noting that the jury "heard and clearly rejected [the defendant's] claim that the robbery was a spur of the moment idea of which he had no knowledge.") (punctuation omitted); cf. *Johnson v. State*, 277 Ga. App. 499, 504-505 (1) (b) (627 SE2d 116) (2006) (In a prosecution for an armed robbery committed by three masked men, the State presented no eyewitness identification of the defendant as one of the participants in the crime; no evidence linking the defendant to the crime scene, the weapon used in the crime, or proceeds of the crime; no evidence that the defendant received any proceeds from the robbery; or any other incriminating evidence. Instead, the evidence showed only that the defendant was an associate of his co-defendants and was with them "at some point before and after the time of the alleged crimes." Consequently, this Court held that there was insufficient evidence to support his conviction, noting that a conviction cannot be based solely upon mere presence or "guilt by association.").

14

outcome of the trial would have been different.[17] The criminal defendant must overcome the strong presumption that trial counsel's conduct falls within the broad range of reasonable professional conduct. [The appellate court accepts] the trial court's factual findings and credibility determinations unless clearly erroneous, but [it] independently appl[ies] the legal principles to the facts.[18]

"Since an appellant claiming ineffective assistance of counsel must show both deficient performance and actual prejudice stemming from that deficiency, an insufficient showing on either of these prongs relieves the reviewing court of the need to address the other prong."[19]

During the hearing on the motion for new trial in this case, the Appellant's trial counsel explained that he did not call an expert on BPS to testify at trial because he had been retained and was being paid by the Appellant's mother, and she could not afford to pay for a psychological examination of the Appellant or an expert witness. Counsel also testified that he did not ask the court for funds to hire an expert witness

---

[17] See *Strickland v. Washington*, 466 U. S. 668 (104 SCt 2052, 80 LE2d 674) (1984).

[18] *Robinson v. State*, 277 Ga. 75, 75-76 (586 SE2d 313) (2003) (additional citations and punctuation omitted).

[19] *Williams v. State*, 277 Ga. 853, 858 (6) (a) (596 SE2d 597) (2004) (citation and punctuation omitted).

15

because he did not think it would be granted, since he had been retained, not appointed.

Although the Appellant argues that this evidence demonstrates that counsel's failure to hire an expert witness constituted deficient performance, it is unnecessary for this Court to address that issue, because the Appellant has failed to meet her burden of demonstrating the second prong of the *Strickland* ineffective assistance standard, i.e., that she was prejudiced by counsel's deficient performance.[20]

> In assessing the prejudicial effect of counsel's failure to call a witness (whether that failure resulted from a tactical decision, negligent oversight, or otherwise), a [defendant] is required to make an affirmative showing that specifically demonstrates how counsel's failure would have affected the outcome of his case. The failure of trial counsel to employ evidence cannot be deemed to be "prejudicial" in the absence of a showing that such evidence would have been relevant and favorable to the defendant.[21]

---

[20] See *Williams*, 277 Ga. at 858 (6) (a).

[21] *Goodwin v. Cruz-Padillo*, 265 Ga. 614, 615 (458 SE2d 623) (1995) (citations and punctuation omitted). See *Ware v. State*, 273 Ga. 16, 18 (3) (537 SE2d 657) (2000) ("Absent a proffer of what the testimony of an expert would have been at trial, a defendant cannot show that there is a reasonable probability that the outcome of the trial would have been different had counsel taken the suggested course.") (citation and punctuation omitted).

In this case, the Appellant's appellate counsel failed to proffer any expert witness' testimony[22] to show that, in the expert's opinion, (1) the Appellant was suffering from BPS at the time of the crimes and (2) as a result, the Appellant may have believed that she was in imminent danger of Ulysse's use of violent force against her if she did not commit the illegal acts at issue.[23] Consequently, because there is no evidence that the testimony of an expert on BPS would have been relevant in this case (absent evidence that the Appellant actually suffered from BPS) or that the testimony would have been favorable to the Appellant's case, the Appellant cannot show that there is a reasonable probability that the outcome of the trial would have been different if counsel had called such an expert witness at trial.[24]

---

[22] Notably, the record does not show that appellate counsel (who was appointed after the Appellant's conviction) filed a motion asking the trial court to approve funds to hire an expert on BPS to examine the Appellant and testify on her behalf during the motion for new trial hearing.

[23] See OCGA § 16-3-26 (coercion).

[24] See *Ware*, 273 Ga. at 18 (3); *Goodwin*, 265 Ga. at 615; see also, e.g., *Darst*, 323 Ga. App. at 622-626 (2) (a) (ii)-(iii), 629-630 (2) (b) (physical precedent only) (In order to demonstrate that trial counsel's failure to present the testimony of certain experts constituted deficient performance that prejudiced the defendant's case and probably affected the outcome of the trial, appellate counsel proffered the testimony of expert witnesses during the motion for new trial hearing, who offered admissible and relevant opinions on children's behavior and forensic interviews that would have rebutted the State's evidence.).

Significantly, all three cases cited by the Appellant in support of her specific claim of ineffective assistance, *Smith v. State*,[25] *Pickle v. State*,[26] and *McLaughlin v. State*,[27] are clearly distinguishable from the instant case, because the defendants in each of those cases proffered the expert testimony at issue in the trial court and demonstrated that the testimony would have been relevant to the issues, favorable to the defendant, and otherwise admissible.[28] For example, in *Smith*, the issue was whether the trial court abused its discretion in excluding the testimony of an expert on BPS, and trial counsel proffered the expert's testimony outside of the jury's presence.[29] The expert testified that she had interviewed the defendant and the defendant's family members and had concluded that the defendant suffered from what was then referred to as "Battered Woman's Syndrome."[30] Similarly, in *Pickle*, in order

---

[25] 247 Ga. 612, 613-614 (277 SE2d 678) (1981).

[26] 280 Ga. App. 821 (635 SE2d 197) (2006) (physical precedent only as to Division 1 (a)).

[27] 338 Ga. App. 1 (789 SE2d 247) (2016) (physical precedent only).

[28] We also note that the relevant portions of both *Pickle* and *McLaughlin* are not binding precedent for this Court, but are, instead, physical precedent only. See Court of Appeals Rule 33 (a).

[29] See *Smith*, 247 Ga. at 613-614.

[30] See id.

to show that the trial court erred in excluding the testimony of an expert on BPS and to perfect the appellate record, trial counsel proffered the testimony of the expert, who would have explained to the jury how the specific facts of the case "fit within the cycle of violence" of an abusive relationship.[31] Finally, in *McLaughlin*, in order to demonstrate that trial counsel's failure to present the testimony of an expert on BPS constituted deficient performance that probably affected the outcome of the trial, appellate counsel proffered the testimony of an expert witness during the motion for new trial hearing.[32] The expert testified that he had examined the defendant; that, in his opinion, she suffered from BPS at the time she committed the offense at issue; and that he would have testified at trial about how the syndrome influences a person's perceptions and reactions to situations.[33]

Because the Appellant in this case failed to proffer the testimony of an expert on BPS and, as a result, failed to meet her burden of demonstrating prejudice that

---

[31] See *Pickle*, 280 Ga. App. at 823 (1) (a).

[32] See *McLaughlin*, 338 Ga. App. at 8-9.

[33] See id.

19

arose from counsel's failure to call the expert at trial, it necessarily follows that she cannot prevail on her claim of ineffective assistance of counsel.[34]

3. The Appellant argues that the trial court erred in imposing a felony sentence on her conviction for theft by taking of a motor vehicle, which was based on her act of driving Gardner's 2002 Honda Accord away from the motel shortly after Ulysse robbed him and took his keys. She argues that the State failed to prove that the fair market value of Gardner's car was more than $1,500 at the time the theft was committed.

Under OCGA § 16-8-12 (a) (1) (C), the determination of whether a theft by taking is classified as a misdemeanor or a felony for sentencing purposes is whether the fair market value of the stolen property was more than $1,500 but less than $5,000 at the time of the crime.[35] Thus, the trial court was only authorized to sentence the Appellant for felony theft by taking if the State presented sufficient evidence for the

---

[34] See *Ware*, 273 Ga. at 18 (3); *Goodwin*, 265 Ga. at 615-616.

[35] See *Williams v. State*, 328 Ga. App. 898, 900 (1) (763 SE2d 280) (2014); see also *Partin v. State*, 302 Ga. App. 589, 590 (692 SE2d 32) (2010) ("The proper measure of value [in a theft by taking case] is the fair cash market value either at the time and place of the theft or at any time during the receipt or concealment of the property.") (punctuation and footnote omitted).

jury to find that, at the time the Appellant stole Gardner's car, the car was worth at least $1,500.01.[36]

Although Gardner never testified about how much his 2002 Honda Accord cost when it was purchased as a "certified pre-owned" car in 2009, he did testify that he would not sell it for less than $1,500 at the time of the Appellant's trial. Gardner testified that, at the time the Appellant stole his car, there was nothing mechanically wrong with it and it had less than 200,000 miles on the odometer, but it did have a dent in the right front fender. Gardner also stated that, a few months after the April 2015 armed robbery, his car had been damaged in an accident, and it cost $4,000 to repair it. In addition, the State showed the jury what the car actually looked like at the time of the theft by presenting photographs of the car and a surveillance tape of the Red Roof Inn parking lot.[37]

> While it is true that evidence of purchase price, standing alone, is insufficient to establish stolen property's value, cost price of an item coupled properly with other evidence such as a showing of the condition of the item at the time of purchase and at the time its value is in issue

---

[36] See OCGA § 16-8-12 (a) (1) (C); *Partin*, 302 Ga. App. at 590.

[37] The trial transcript shows that the court instructed the jury that the State had the burden of proving the fair market value of Gardner's car beyond a reasonable doubt and that its verdict should include its finding as to the car's value.

may be admitted as an element upon which an opinion may be formed as to the item's value. Direct proof of value is not essential in prosecutions for theft by taking but proof of value may be shown by inference.[38]

In this case, the testimony Gardner provided in regard to the value of his car is analogous to that provided by the victim in *Wilson v. State*.[39] In *Wilson*, the victim's television, stereo, speakers, handbags, and comforter were stolen.[40] While testifying as to the value of each item, the victim also provided the court with the condition each item was in at the time of the theft.[41] This Court concluded that the victim's testimony as to the age and condition of the stolen items, coupled with the original cost of each item, provided a basis for her opinion that the value of the stolen items exceeded the minimum value to authorize a felony sentence.[42]

---

[38] *Wilson v. State*, 304 Ga. App. 743, 747 (1) (c) (698 SE2d 6) (2010) (punctuation and footnotes omitted).

[39] 304 Ga. App. at 746-747 (1) (c).

[40] See id.

[41] See id.

[42] See id. at 747 (1) (c); see also OCGA § 24-14-8 ("The testimony of a single witness is generally sufficient to establish a fact.").

Similarly, we find that there was sufficient evidence to support the jury's conclusion that the fair market value of the 2002 Honda Accord was more than $1,500. Consequently, the trial court did not err in sentencing the Appellant for a felony on her conviction for theft by taking.

*Judgment affirmed. Miller, P. J., and Doyle, J., concur.*